HASTINGS OIL COMPANY ET AL V. THE TEXAS COMPANY ET AL.

No. A-2623. Decided November 15, 1950.
Rehearing overruled December 20, 1950.
(234 S. W., 2d Series, 389.)

418

*J. E. Davant,* of Bay City, *Masterson & Pope* and *Alex Pope, Jr.,* all of Angleton, petitioners.

The Court of Civil Appeals erred in holding that Rule of Civil Procedure 167 authorized the issuance by the trial court of an order for a directional survey of petitioners' well hole. Kountze v. Cargill, 86 Texas 386, 25 S. W. 13; Austin & N. W. Ry. Co. v. Cluck, 97 Texas 172, 77 S. W. 403; Equitable Tr. Co. v. Jackson, 101 S. W. 2d 552 (Com. App.)

*D. D. Pollan* and *Wm. E. Loose,* both of Houston, for respondent.

MR. JUSTICE BREWSTER delivered the opinion of the Court.

This is an injunction suit filed by The Texas Company et al., respondents, against Hastings Oil Company et al., petitioners. A trial court order granting a temporary injunction was affirmed by the Court of Civil Appeals. 227 S. W. 2d 317.

Petitioners and respondents own oil and gas leases on adjoining tracts of land, petitioners' being known as the Mays and respondents' as the Phillips. Both tracts lie on the north flank of the West Columbia salt dome, for which reason the subsurface oil formations slope from the apex of the dome downward in a northerly direction. The Mays tract lies northwest of the Phillips; and there are wells on the Phillips producing oil from the Marginulina and Frio formations.

Respondent The Texas Company formerly owned a lease on the Mays tract and from July, 1947, to May, 1948, drilled three non-producing wells thereon. These wells were known as The Texas Company's Mays No. 1, No. 2, and No. 3, and were drilled to a depth of 9646 feet, 9296 feet and 9068 feet, respectively.

Respondents allege that they were drilled as nearly vertical as practicable.

In Mays No. 1 the Marginulina sand was found at 5816 feet, but it was only 4 feet thick; the Frio sand was struck at 6812 feet, but it was only 6 feet thick. This thinness of the formations and the insufficient saturation of cores taken therefrom did not justify any reasonable belief that oil could be produced in paying quantities.

So, on August 19, 1948, The Texas Company duly released its lease on the Mays tract. On February 17, 1949, the owners of the tract executed an oil and gas lease on it to one Williams, which by mesne assignments became the property of Petitioner Hastings Oil Company.

Respondents allege that on June 1, 1949, petitioners went onto this lease with a drilling rig, entered the surface casing which The Texas Company had placed in the Mays No. 1 at 1156 feet and, somewhere above a string of 7-inch casing which it had also set in the well at 1706 feet, "sidetracked" The Texas Company well hole and continued to drill an oil well to a total depth of about 6840 feet. By trial amendment, respondents allege that at an approximate depth of 1400 feet petitioners "directionally deviated said bore hole from the vertical by twice running a spudding bit oriented on the drill pipe in a predetermined direction and by twice placing a whipstock in the bore hole at approximately the aforesaid depth oriented on the drill pipe and faced in the same direction as the spudding bit had been oriented, and thereby directionally deviated the hole from the vertical in a southerly direction, up-dip on the subsurface formation at an angle of from 4° to 6°, and continued the drilling of the hole at said angle and in said direction for approximately 36 feet"; that, therefore, when the hole encountered the Marginulina and Frio sands it had so deviated southeasterly from the vertical that it was in the subsurface of the Phillips tract approximately 250 feet southeast of the line between the Phillips and Mays tract; that this amounted to a trespass.

Respondents allege, upon information and belief, that petitioners are planning or endeavoring to perforate their 7-inch casing in the Frio sand, between 6750 and 6758 feet and, if oil in paying quantities is found, to complete the well and produce the oil therefrom; that, if it is not so found, they will plug back to the Marginulina sand and attempt to produce oil from it; and

that, unless restrained they will "actually bring said well into production" and take oil from the subsurface of the Phillips tract.

Then they make the allegations which raise the principal question in this case. They say that "while the available and pertinent sub-surface data reasonably indicates that the well hole so drilled by defendants, as aforesaid, has entered within the sub-surface of the Phillips tract, as aforesaid, that fact cannot be determined with definiteness and certainty except from a directional survey of the hole conducted by an expert"; that their information and belief is that petitioners made no deviational survey while drilling the well and no directional survey when it was completed; that petitioners had refused respondents' request to have a directional survey made at respondents' expense.

Their prayer is for a temporary restraining order "preserving the status quo" and restraining petitioners from doing anything which would make a directional survey of the well more difficult or expensive and from completing the well for the production of oil or gas from either the Marginulina or Frio sands; for citation to petitioners to appear and show cause why a temporary injunction should not issue continuing in full force and effect the provisions of the temporary restraining order until final hearing and enjoining petitioners from interfering with the making of a directional survey of the well as ordered by the court; that on the hearing for temporary injunction the court appoint some one skilled in making such directional surveys and to "report to the court definitely and with certainty the position of said well hole from the surface to the bottom with reference to the surface of said hole and with reference to the common boundary line between the said Mays tract and the Phillips tract" and if it be found from this report that the hole, either at the Frio or Marginulina sands, is within the subsurface of the Phillips tract, the temporary injuction be continued in force until final hearing; and that on final hearing, the petitioners be ordered to plug their well hole in so far as it is situated in the subsurface of the Phillips tract.

The trial court granted the temporary restraining order as prayed. After two or three extensions, the order was finally "extended until the conclusion of the hearing of plaintiffs' application for an order of this court appointing and directing an expert to make and report to this court the results of a subsurface directional survey of defendant Hastings Oil Com-

pany's Mays No. 1 well and for such ancillary temporary injunctive relief as may be necessary to accomplish such purpose."

On July 22, 1949, the hearing was begun under petitioners' sworn answer, which, following a general denial, specifically denies (1) that available and pertinent subsurface data reasonably indicates that their well hole has entered the subsurface of the Phillips tract, (2) that a directional survey is the only method by which to determine definitely whether their well hole has entered the subsurface of the Phillips tract, (3) that their well hole has entered the subsurface of the Phillips tract, (4) that their well is located at a point 175 feet or less from the southeast line of the Mays tract, and (5) that The Texas Company's Mays No. 1 well was drilled in a true vertical direction. Affirmatively, petitioners ask that if an expert be appointed that he make a deviational rather than a directional survey and if it shows that there has been no trespass on respondents' lease that the expert be discharged; and, if the survey shows to petitioners' satisfaction that a trespass has been committed, that they be permitted to plug the well back to the point of trespass, thereby foreclosing the necessity of revealing to respondents any information that is made available by the survey.

After hearing the testimony the trial court found: (1) that "there is probable cause to believe" that the bore hole of petitioners' well has so deviated from the vertical that, at the points where it encountered the Marginulina sand at 5716 feet and the Frio sand at 6750 feet, the hole is within the subsurface of the Phillips tract; (2) that "there is probable cause to believe" that petitioners by permitting the bore hole of their well so to enter the subsurface of the Phillips tract have committed a trespass, and are committing a continuing trespass, upon the Phillips tract, but (3) that whether the well has actually entered the subsurface of the Phillips tract cannot be determined with certainty unless a directional survey of the well is made by an expert; (4) that a determination of that question of fact with certainty is essential to a just and proper decision of, and will be a conclusive determination of, the controversy at bar at the final trial on its merits; (5) that, therefore, applicable rules of equity entitle respondents to have such a survey made, reported to the court and made available to all parties, under conditions ordered by the court.

The conditions were that two designated concerns, the one qualified to make the survey and the other furnishing the man power, were to take over a drilling rig, equipment and supplies

which petitioner, Hastings Oil Company, owns and has at the site of the well, make the survey and file with the clerk of the trial court two reports. One was the report of a directional survey showing degrees of deviation from the vertical and the direction of such deviations of the bore hole of petitioners' well. The surveyor was to keep no private record of this survey but was ordered to place all data respecting it in a sealed envelope and file the same with the clerk, who was to hold the report unopened subject to further orders of the court. The other report was to be filed with the clerk as a public document. It was to furnish all data with regard only to degrees and distances of deviation from the vertical of the bore hole of petitioners' well, "but not the directions of such deviations", at depths of from 5716 to 5738 feet and from 6750 to 6800 feet. Respondents were required to deposit $2500 to cover cost of the surveys (to be considered ultimately as court costs), a bond to reimburse petitioners for any damage to their rig and equipment while being used in the survey, and an injunction bond. After these requirements were met the surveyors were authorized to go upon the Mays lease and take possession of petitioners' rig and equipment; and, except for one representative to witness the survey, petitioners were enjoined from going to the well site and from interfering with the surveyors' use of petitioners' rig and equipment until after the survey had been completed and reported to the court. The report of the directional survey was to be kept sealed and secret until the appellate courts have determined the trial court's authority to order the survey, in deference to petitioners' claim that otherwise the question would become moot. But if the report of the diviational survey showed that at depths of from 5716 to 5738 feet or from 6750 to 6800 feet the bore hole of the well had deviated from the vertical, without regard to the direction, as much as 175 feet, and after respondents had filed a proper injunction bond in the sum of $10,000, petitioners "are hereby enjoined until and subject to the further orders of this court from completing said well as a producing oil or gas well", such temporary injunction to be issued by the clerk after the surveyors' report had been filed showing such deviation.

On August 10, 1949, the two survey reports were filed with the clerk, and the temporary injunction was issued and served as directed in the court's order.

Writ of error was granted upon the point that the Court of Appeals "erred in holding that Rule 167, Texas Rules of Civil

Procedure, authorized the issuance by the Trial Court of an order for a directional survey of Petitioners' well hole."

The question at bar has never been decided in Texas and we have found it difficult, largely because it has been decided in some other jurisdictions on basis either of the theory of inherent court powers or of statutes differing from our applicable rules.

■ This court has steadfastly held to the doctrine that Texas courts have no inherent powers, either at law or in equity, not even to originate new process to enable parties to secure evidence in support of their cases. Messner v. Giddings, 65 Texas 301, 309; Austin & N. W. Ry. Co. v. Cluck, 97 Texas, 172 77 S. W., 403; Ex Parte Hughes, 133 Texas, 505, 129 S. W. 2d 270. We reaffirm that holding; in fact, respondents disclaim any suggestion that we should relax it. So if the trial court had authority to issue the order complained of it must be found in the written law or it must arise by reasonably necessary implication therefrom.

Rule 167, T. R. C. P., supra, reads: "Upon motion of any party showing good cause therefor, and upon notice to all other parties, the court in which an action is pending may order any party to *produce and permit the inspection* and *copying* or *photographing* by or on behalf of the moving party *of any designated documents, papers* (except written statement of witnesses), *books, accounts, letters, photographs, objects or tangible things,* not privileged, *which constitute or contain evidence material to any matter involved in the action * * *.*" (Italics ours.) Respondents assert that since the survey in question is principally and essentially accomplished by a photographing of petitioners' well hole, the trial court's authority to order it is conferred by the language "photographing * * of any * * objects or tangible things". Petitioners contend that this language does not confer the power claimed because (1) since everything specified after the word *documents,* except the final words *objects or tangible things,* is in some sence a document the words *objects and tangible things* are, under doctrine of *ejusdem generis,* applicable only to things having the general nature of documents, thus excluding an oil well hole; and (2) since Rule 167 is copied from section 1, of Federal Rule 34, Fed. Rules Civ. Proc., 28 U. S. C. A., but does not include its section 2, which reads: "*order any party to permit entry upon designated land or other property in his possession and control for the purpose of inspecting,* measuring, surveying *or photographing*

the property or *any relevant* object or *operation* thereon", a purpose not to bestow the power is clearly shown. But we do not have to decide that question because we have concluded that the authority exercised by the trial court is conferred by Rule 737, T. R. C. P., relating to discovery, which reads:

"All trial courts shall entertain suits in the nature of bills of discovery, and grant relief therein *in accordance with the usages of courts of equity*. Such remedy shall be cumulative of all other remedies. In actions of such nature, the plaintiff shall have the right to have the defendant examined on oral interrogatories, either by summoning him to appear for examination before the trial court as in ordinary trials, or by taking his oral deposition in accordance with the general rules relating thereto." (Italics ours.) Except for the addition of the last sentence, Rule 737 is a copy of Art. 2002, R. S., 1925, Acts 1923, Reg. Ses., G. L., ch. 19, p. 31.

According to an article by Col. W. S. Simkins, appearing in 2 Texas Law Review, p. 98, by the adoption of the common law as the rule of decision in this state, by Act of Congress, 1840, Gammel's Laws of Texas, vol. 2, p. 3, parties to the record having an interest in the case were incompetent to testify. That made it necessary to file bills of discovery "in chancery, in which courts the chancellor could require of the parties to the suit a full confession of the facts, which could be used as evidence in the cause at law." This forced resort to a separate suit for discovery was obviated, however, by statute of 1846, Gammel's Laws of Texas, vol. 2, p. 1690, providing that either party to a suit could propound *written* interrogatories to the other after making oath that the facts sought were material and not provable by any other known person; that failure to answer was a confession of all material interrogatories. In 1858, by Acts 7th Leg., Reg. Ses., G. L., p. 110, Gammel's Laws of Texas, vol. 4, 982, it was enacted that either party could examine the opposite party as a witness either personally in court or by interrogatories filed in court, which interrogatories could be issued and taken ex parte; and there were no restrictions on corporate parties issuing interrogatories ex parte. However, by statute passed in 1897, Acts 24th Leg., Reg. Sess., G. L., ch. 92, p. 117, Gammel's Laws of Texas, vol. 10, p. 1171, it was provided that where either party to any suit was a corporation neither party could take ex parte depositions. According to Col. Simkins, it was the purpose of the legislature in passing Art. 2002, supra, to repeal this act of 1897 and restore the provision of the act of 1858 that an ex parte deposition may be taken where a corporation is a party.

However, Art. 2002 was given a broader construction and application than that. In fact, every expression on the subject has served to broaden its scope. For example, in Chapman, Com'r., v. Leaverton (Civ. App.), 263 S. W. 1083, the court rejected the idea that Art. 2002 was enacted merely as an aid to the deposition statutes. Holding that the article authorizes a bill of discovery to compel a judgment creditor to disclose facts with reference to an alleged fraudulent sale of assets, the court said, "We are of the opinion that the Legislature intended to confer some additional remedy in favor of the plaintiff or the judgment creditor, in order that he might discover facts which would be advantageous to him in the futherance of his cause of action or in the collection of his judgment." That decision was directly contrary to the holding in Cronin v. Gay, 20 Texas, 460, (1857) and Cargill v. Kountze, 86 Texas, 386, 25 S. W. 13 (1893), but, in refusing an application for writ of error, this court approved it, holding that the granting of a bill of discovery under the circumstances stated was "in accordance with the usages of courts of equity." National Compress Co. v. Hamlin, 114 Texas, 375, 387, 269 S. W., 1024, 1029. And see Dallas Joint Stock Land Bank v. The State, 135 Texas, 25, 137 S. W. 2d, 993.

Again, in Samuels v. Finkelstein (Civ. App.), 25 S. W. 2d, 923 (er. dism.), defendant demurred to the petition for a bill of discovery on the ground that plaintiff could develop all facts necessary to establish this cause of action by taking defendants' deposition in the manner provided by the general statutes. The court said that this was not a proper construction of Art. 2002 because it declares that the remedy by discovery shall be cumulative of all other remedies; that *"In developing the extent of the relief to be granted under this express language, recourse must be had only to the general principles of equity jurisprudence,* which are in no way modified or limited by our statutes providing for the taking of depositions and authorizing either party to obtain the testimony of his adversary." (Italics ours.)

So the inquiry resolves itself into this: Is the order granted by the trial court "in accordance with the usages of courts of equity"? In deciding that question we need not determine whether the statute contemplated usages of courts of equity in practice before our statutes were passed providing for the examination of parties or those in practice in the courts of the United States when Art. 2002 was enacted, as might be argued from the holding in Grigsby v. Reib et al., 105 Texas, 597, 153 S. W., 1124. The authorities considered cover the whole period.

Reynolds v. Burgess Sulphite Fibre Co., 71 N. H. 332, 51 Atl., 1075, by the Supreme Court of New Hampshire, was decided in 1902. Plaintiff, as administratrix, sued for damages for the death of her intestate caused by his falling against defendant's engine. Plaintiff alleged that a strap on a connecting rod broke, for which reason the rod broke through the outer case with a loud crash and thereby caused intestate's fatal fall. Plaintiff then filed a suit for discovery alleging that the broken pieces of the strap were in defendant's possession; that it was necessary, in order properly to prepare her damage suit for trial that these pieces be examined by her attorneys and by competent laymen, with a view of testifying, but that defendant had refused to permit an examination. The prayer was for a discovery of the pieces of strap and for their inspection. The trial court sustained a demurrer to the bill. The court cited and reviewed numerous cases, both English and American, in which discovery had been ordered and upheld as to documents and as to personal property other than documents, such as clothes, a machine used to make bobbin lace, iron tubing machinery, paddle wheels, and printer's type. Then it observes, "There is also a line of cases in which an inspection of real estate has been ordered. Lonsdale v. Curwen, 3 Bligh, 168; Walker v. Fletcher, Id., 172; United Co. v. Kynaston, Id. 153; Attorney General v. Chambers, 12 Beav. 159; Lewis v. Marsh, 8 Hare, 97. In a note to the first-named case, Bligh, the reporter, says: 'The practice in courts of equity of granting orders for inspection of mines, machinery, etc., is well settled.'" Pointing out that undoubtedly the defendant, through its officers and agents, could be compelled in a discovery proceeding to produce all the facts within their knowledge tending to show that the strap was defective, the court says there is no sound reason why they may not be compelled to produce the straps themselves. Then, after conceding that defendant's property rights in the broken strap will be interfered with to some extent if required to produce it, the court says that such interference will not differ in kind or degree from that which occurs when a party is required to produce documents; that rights arising from ownership of the strap are no more sacred than would be rights arising from ownership of a plan of the strap; that the infringement of property rights in such cases is justified upon the ground that it is necessary to the administration of justice; and that the origin of the equitable remedy of discovery leads to the conclusion that it may be used to compel the production of chattels, as well as documents, for inspection and examination in aid of an action at law.

In Montana Co. v. St. Louis Mining & Milling Co., 152 U. S., 160, 166, 38 L. Ed., 398, 14 Sup. Ct. 506, decided in 1892, the Supreme Court had to decide whether a Montana statute authorizing the courts to order an examination, inspection or survey of mines when necessary to ascertain, enforce or protect the right or interest of one other than the possessor therein violates the due process clause of the Constitution of the United States. The court cited a number of cases in which inspection orders have been made and upheld, "sometimes under the authority of special statutes and *sometimes by virtue only of the general powers of a court of equity.*" Then, while conceding that most of these cases are recent ones, it observes: "While not decisive of the question, the frequency with which these orders of inspection have of late years been made, and the fact that the right to make them has never been denied by the courts, is suggestive that there is no inherent vice in them. And if courts of equity, by virtue of their general powers, may rightfully order such an inspection in a case pending before them, surely it is within the power of a state by statute to provide the manner and conditions of such an inspection in advance of the suit. To 'establish justice' is one of the objects of all social organizations, * * * and if, to determine the exact measure of the rights of parties, it is necessary that a temporary invasion of the possession of either for purposes of inspection be had, surely the lesser evil of a temporary invasion of one's possession should yield to the higher good of establishing justice." (Italics ours.)

In Culbertson v. Iola Portland Cement Co. et al. 87 Kan. 529, 125 Pac., 81 (1912) which was for an accounting for gas piped from plaintiff's land, a question arose as to whether the gas came from the leased premises or from wells drilled on adjoining land. To help determine that the trial court entered an order to inspect and take measurements of the capacity of a certain well, plaintiff having the right to have its representatives present but being ordered to furnish defendants full facilities with which to take the measurements. It was contended that there was no authority for such an order, hence those acting under it would be trespassers. The Supreme Court granted that there was no specific statutory authority for the order, but declared that "such orders have been made by courts of equity from the beginning", citing several of the cases cited in Montana Co. v. St. Louis Mining Co., supra.

There are other helpful authorities. For example, in Union Oil Co. v. Reconstruction Oil Co. 4 Cal. 2d 541, 51 Pac. 2d 81,

(1935) plaintiff alleged, under oath but upon information and belief, that defendants had whipstocked their well and thereby drilled it under surface leased by plaintiffs. They sought and got a trial court order for a deviational and directional survey of the well. Although the Supreme Court concluded that the order was interlocutory and not appealable, it did take occasion to say that the order was in the exercise of the *inherent* power of the court to make in compelling an adverse party to furnish evidence to the other party upon proper application, citing depositions of adverse parties, orders for inspection of documents and the issuance of subpoenas duces tecum as recognized examples of this power.

Another case applying the "inherent power" theory to facts closely parallel to those in the case at bar is Texas Co. v. Hollingsworth, 304 Ill. App. 607, 27 N.E., 2d 67, decided by the Fourth Appellate Court of Illinois in 1940, and reversed by the Supreme Court of that state on other grounds in 375 Ill. 536, 31 N.E., 2d, 944.

See, also Williams et al. v. Phiel, 66 Fla. 192, 63 So., 658 (1913) Gliptis et al. v. Fifteen Oil Co., 204 La., 896, 16 So. 2d., 471; Thomas Iron Co. v. Allentown Mining Co., 28 N. J. Eq. R. 77; State ex rel. Geyman et al. v. Dist. Ct. et al. 26 Mont. 483, 68 Pac., 861; 58 C. J. S., Mines and Minerals, Sec. 142, and cases cited in the footnotes; 27 Am. Jur., Discovery and Inspection, Secs. 2, 21 and 24; Annotation, 33 A. L. R., 16; and Pomeroy's Eq. Juris. (5th Ed.), vol. 1, Secs. 195 and 207b.

■ While the power exercised by the trial court in this case has been denied as a proper usage of equity courts by some authorities, it has very definitely been recognized as a proper usage by others; and we regard the latter as the sounder and better reasoned. Some of these cases base the usage on the theory of inherent power, some say it was one of the general powers of a court of equity from the beginning, and some ground it on statutory provisions; but the fact remains that, whatever its source, it was a well-recognized usage of courts of equity both when Art. 2002 was enacted and when Rule 737, T.R.C.P. was adopted.

Respondents allege, upon information and belief, that petitioners have trespassed upon their property by drilling into their subsurface and they allege facts which tend to support that belief. They offer to do equity in connection with their prayer for a deviational and directional survey to determine the mat-

ter with definiteness and certainty. The trial court heard the testimony, found there is probable cause to believe that the trespass has occurred and ordered the survey under conditions which would seem adequately to protect petitioners' true interests. Under those circumstances, we cannot say that the court's order was not in accord with proper usage of a court of equity. We hold, therefore, that the court did not err in making the order. At most, it was but an extension of the trend revealed in Chapman, Com'r., v. Leaverton, supra, Samuels v. Finkelstein, supra, Southern Bag & Burlap Co. v. Boyd, 120 Texas, 418, 38 S. W. 2d., 565, and Rush v. Browning, 103 Texas, 649, 132 S. W. 763. It was in line with the public policy of this state as declared in Rule 796, T. R. C. P., authorizing a trial court in cases of trespass to try title to appoint a survey or to go upon the premises in controversy, make a survey and report his findings. It was entered "by virtue of that power ancillary to the exercise of the duties of a court of equity" as a means for the attainment of justice. See Byrd Irr. Co. v. Smythe (Civ. App.), 146 S.W., 1064.

■ Petitioners further contend that the order of the court granting the temporary injunction violates the express terms of Art. 4644, R. S., 1925, because respondents do not allege or claim that petitioners are insolvent. That article provides:

"No injunction or temporary restraining order shall ever be issued prohibiting sub-surface drilling or mining operations on the application of an adjacent landowner claiming injury to his surface or improvements or loss of or injury to the minerals thereunder, unless the party against whom drilling or mining operations is alleged as a wrongful act is shown to be unable to respond in damages for such injury as may result from such drilling or mining operations, provided, however, that the party against whom such injunction is sought shall enter into a good and sufficient bond in such sum as the judge hearing the application shall fix, securing the complainant in the payment of any injuries that may be sustained by such complainant as the result of such drilling or mining operations. The court may, when he deems it necessary to protect the interests involved in such litigation, in lieu of such bond, appoint a trustee or receiver with such powers as the court may prescribe to take charge of and hold the minerals produced from the lands of those complained against or the proceeds thereof subject to the final disposition of such litigation."

This statute was enacted in 1919, and respondents claim that contemporary judicial history shows that it was not in-

430

tended to apply to cases like this. Both when the statute was introduced and when it was passed on March 17, 1919, it had not been authoritatively determined that, because of the fugitive character of oil in place, one who drills a well on his own premises becomes the owner of all oil that comes out of it although it may come from a pool extending under the premises of an adjoining owner. At that time suits were pending in which injunctions were sought to prevent oil well owners from producing oil under those circumstances; and there was uncertainty as to what the courts would decide. Therefore, respondents argue, Art. 4644 was passed to insure that such production could not be enjoined by the courts. One such suit was Hodges v. Christmas, filed on October 3, 1918, and decided by the Court of Civil Appeals on May 2, 1919. 212 S. W., 825. Another was Prairie Oil & Gas Co. et al. v. State, filed on January 29, 1919, and decided on June 2, 1919. 214 S. W., 363. On appeal of the latter case to this Court the Commission of Appeals held that such production was lawful, 231 S. W. 1088, hence could not be enjoined. We have concluded that respondents are correct in suggesting that to correct this then uncertain situation was the purpose of the Legislature in passing Art. 4644. This theory finds support in the last sentence of the article where it is provided that in lieu of an indemnity bond the court may appoint a receiver "to take charge of and hold the *mineral produced from the lands of those complained against* or the proceeds thereof subject to final disposition of such litigation." (Italics ours.) This indicates that the article was intended to refer to one taking oil from *his own land,* not to one taking oil from the land of the adjoining owner by means of a deviated well. Therefore we hold that Art. 4644 is no bar to injunctive relief in behalf of respondents.

Town of Refugio v. Strauch (Com. App.), 29 S. W. 2d, 1041 and Magnolia Petroleum Co. v. McClendon et al., 123 Texas 10, 65 S. W. 2d, 484, are nc͏ ͏ ͏the way of our holding because in neither of them did the ͏ ͏ ͏tiff seek to restrain the threatened production of oil from a ͏ ͏ll admittedly begun on defendant's surface but allegedly cor ͏ ͏ted in plaintiff's subsurface, as is the situation here.

Petitioners contend, ͏ ͏ ͏er, that the issuance of the temporary injunction was not ͏ ͏horized because it was premature in that the well had not be ͏ ͏mpleted as a producer and therefore the only possible dam; ͏ ͏to respondents was a penetration of their subsurface and d. ͏ ͏ge to the lateral support. Thus, they argue, this is a case of ͏ ͏mage without injury. They insist

that it does not merely maintain the status quo but gives respondents all they could obtain by a final judgment.

We do not think the temporary injunction must fall under any of these attacks.

■ In High on Injunctions (4th Ed.), vol. 1, p. 693, sec. 730, it is said that in instances of trespass to mining property greater latitude is allowed courts of equity than in restraining ordinary trespass to realty, "since the injury goes to the immediate destruction of the minerals which constitute the chief value of this species of property." Trespasses of this character are irreparable because they subtract from the very substance of the estate, hence equity is quick to restrain them. See note to Jerome v. Ross, 11 Am. Dec., 484, 500, 501. Moreover, "it is obvious that where the trespass is continuous in its nature, constantly adding to the injury, the legal remedy is inadequate because a jury cannot fix upon a time when the wrong may be said to be complete." Id., p. 504. Amick et al. v. Gauley Coal Land Co., 119 W. Va. 485, 194 S. E., 268; Harris v. Krekler, 113 Ind. App. 190, 46 N. E. 2d, 267.

While it is true that petitioners' well has not been completed, nevertheless the respondents allege that it will be completed and within their subsurface and oil taken therefrom. After hearing the testimony the trial court found that there is probable cause to believe that these allegations are true, hence that petitioners are committing a continuing trespass upon respondents' tract. Under those circumstances the temporary injunction was not beyond the discretion of the trial court to grant. Indianapolis Nat. Gas Co. v. Kibby, 135 Ind. 357, 35 N. E., 392; Quality Excelsior Coal Co. v. Reeves, 206 Ark. 713, 177 S. W. 2d, 728. Petitioners' contentions are discussed in 43 C. J. S., Injunctions, Secs. 56, 61, 62, 63 and 64.

■ Petitioners urge that granting injunctive relief in this case required a location of the boundary line between the Mays and Phillips tracts and that therefore the trial court erred in overruling their plea in abatement suggesting that some royalty holders, owners and others at interest in the two tracts were not parties to this suit. We cannot pass on that question because the trial court's ruling on the plea in abatement was an interlocutory order and is not appealable, although it comes along with the interlocutory order of temporary injunction. Zanes et ux. v. Mercantile Bank & Trust Co. et al. (Civ. App.), 49 S. W.

2d. 922 (er. ref.) ; Magnolia Petroleum Co. et al. v. State (Civ. App.), 218 S. W. 2d., 855 (er. ref., N. R. S.).

The judgments below are affirmed.

Opinion delivered November 15, 1950.