produce the Sturzenegger documents as ordered by this court.

4. Overrule plaintiff's motion to require defendants to cooperate with plaintiff in preparing applications to the Swiss Government for production of the Sturzenegger papers.

5. Grant the motion of intervenor plaintiffs that the dismissal of this suit shall not apply as to their claims.

## WILLIAMS et al. v. CONTINENTAL OIL CO.

### Civ. No. 5149.

United States District Court,
W. D. Oklahoma.

Feb. 16, 1953.

Bierer & Bierer, Guthrie, Okl., Duke Duvall, Oklahoma City, Okl., and Glenn O. Wallace, Wewoka, Okl., for plaintiffs.

Richardson, Cochran, Dudley, Fowler & Rucks, Oklahoma City, Okl., for defendant.

WALLACE, District Judge.

The plaintiffs bring this action to recover for oil allegedly taken in the past and still being taken from the plaintiffs' land by a well of defendant's surfaced adjacent to plaintiffs' land but allegedly off-vertical to

the extent that it is bottomed on the plaintiffs' property.

The well is the Continental Oil Company's Munah Cosar Well No. 1; it is located on the surface at a point approximately 333 feet west and 330 feet north of the southwest corner of plaintiffs' 40 acres.

The plaintiffs filed a motion under Rule 34 of the Federal Rules of Civil Procedure[1] and in it requested this court to order a subsurface directional survey of this well in order to establish whether or not there has been a subsurface trespass.

A hearing of some four days was conducted in regard to this motion.

Apparently, this is the first time a request of this kind has been made under Rule 34. However, there seems little question but what the court has the *power* to compel such a survey where the facts so warrant.[2]

Rule 34, as distinguished from some of the other discovery rules, requires that the moving party affirmatively show "good cause".[3] Doubtless, the general standard for "good cause" as applied to documentary discovery has been fully met here. Such a survey would furnish competent, relevant and material evidence to be used when this case is tried on its merits; it is undisputed that such a survey would greatly aid the plaintiffs in the preparation of their case; and, further, this survey is the only means by which the desired data can be obtained.[4] However, implicit in this showing of "good cause" is the basic standard which requires the court to exercise this discretionary power in a *reasonable* manner. Certainly for a court to indiscriminately or promiscuously grant directional surveys without any showing of a *probability* of trespass would be

1. Fed.Rules Civ.Proc. rule 34, 28 U.S.C. A. provides:

"Upon motion of any party showing *good cause* therefor and upon notice to all other parties, and subject to the provisions of Rule 30(b) [which provides certain safeguards against annoyance, embarrassment, or oppression], *the court in which an action is pending may* (1) order any party to produce and permit the inspection and copying or photographing, by or on behalf of the moving party, of any designated documents, papers, books, accounts, letters, photographs, objects, or tangible things, not privileged, which constitute or contain evidence relating to any of the matters within the scope of the examination permitted by Rule 26(b) [which defines the scope of inquiry to include immaterial testimony which appears reasonably calculated to lead to the discovery of admissible evidence] and which are in his possession, custody, or control; or (2) *order any party to permit entry upon designated land or other property in his possession or control for the purpose of inspecting, measuring, surveying, or photographing the property* or any designated object or operation thereon within the scope of the examination permitted by Rule 26(b). The order shall specify the time, place, and manner of making the inspection and taking the copies and photographs and may prescribe such terms and conditions as are just. * * *" (Emphasis supplied.)

2. See Humble Oil & Refining Co. v. Sun Oil Co., 5 Cir., 175 F.2d 670 regarding a *surface* survey under this rule. Also, see 1 Summers Oil & Gas § 26.

3. In Martin v. Capital Transit Co., 83 U.S.App.D.C. 239, 170 F.2d 811, 812 the court said: "Rule 34 authorizes the District Court to order production of documents, papers, etc., upon motion of a party 'showing good cause,' not upon a mere allegation or recitation that good cause exists. The rule contemplates an exercise of judgment by the court, not a mere automatic granting of a motion. The court's judgment is to be moved by a demonstration by the moving party of its need, for the purposes of the trial, of the document or paper sought. This view is confirmed by the Supreme Court in Hickman v. Taylor, 1947, 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451." See also Safeway Stores v. Reynolds, 85 U. S.App.D.C. 194, 176 F.2d 476; Alltmont v. United States, 3 Cir., 177 F.2d 971; Reynolds v. United States, 3 Cir., 192 F.2d 987.

4. See 4 Moore's Federal Practice (2nd Addi.) Sec. 34.08 regarding what constitutes "good cause".

unreasonable and not within the purview of Rule 34.

A close reading of the cases where state courts have ordered directional surveys, either under express statutory authority or under the inherent powers of equity, reveals facts which unmistakably reflect that a mere *possibility* of trespass is not sufficient,—there must be some *probability* of trespass. Although these cases are not binding upon this court in its application of Rule 34, the principles they enunciate are highly persuasive in judging just what constitutes a reasonable exercise of this discretionary power.

In the leading case of Texas Co. v. Hollingsworth,[5] the plaintiff held leases on a substantial amount of land; between these holdings of the plaintiff the defendants leased a small strip of land which was one-half mile long, thirty-three feet wide, at one end, and just six feet wide, at the other end. On this strip, which averaged some nineteen feet in width, the defendants caused nine wells to be drilled. The complaint alleged that these wells of the defendants were not bottomed directly beneath their strip of land, but were in fact bottomed on the plaintiff's land; the complaint further alleged that inasmuch as these wells were drilled by rotary drills, it was not possible that the bore holes proceeded exactly straight down to the producing horizons. Along with the complaint the plaintiff filed its petition requesting that a subsurface directional survey be made of the nine wells. Attached to the complaint were affidavits of qualified drillers corroborating the verity of the plaintiff's allegations.

The Illinois Supreme Court reversed the decree of the circuit court and held that the lower court had the *power* to order a survey. The importance which the Court attached to the showing of *probability* of trespass was vividly emphasized by the statement,[6]

"*It is shown to the court intelligently, and supported by the best evidence which can be obtained on the question, that the matters and things alleged in the complaint are true;* that there is only one way of finding out the truth of whether a trespass is being committed, whether wrong is being done, and that is by means of the directional subsurface survey prayed for. *In addition to this evidence the court was surrounded by the very strong circumstance that in all human probability the matters complained of were being committed. It is highly probable, we think, that the things complained of are true.* Here is a strip of land that is six feet wide at one end. Is it possible to drill oil wells on this strip of land to the depths that they must necessarily go and to which the wells in question have gone, and have them bottom on the same six foot strip? A deviation of only three feet would put the bottom of the hole over on plaintiff's land. * * *" (Emphasis supplied.)

In Gliptis v. Fifteen Oil Co.[7] the Supreme Court of Louisiana ruled that a court of equity had the inherent power to order a directional survey and required the trial court to so do. The facts in this case accent once again the roll played by *probability* of trespass. The defendant's well was drilled some *33 feet* from the property line of the plaintiff, and some 333 feet from the surface location of a well of plaintiff's. When the defendant's well was opened and gas in large quantities was permitted to escape, the gas pressure in the plaintiff's well immediately dropped and shortly thereafter the plaintiff's well "went dead". The Louisiana Court cited the Texas Company case as being on all fours.

The Supreme Court of Texas in Hastings Oil Co. v. Texas Co.[8] held that the trial court had the authority to order a di-

---

5. 1940, 304 Ill.App. 607, 27 N.E.2d 67. Reversed 375 Ill. 536, 31 N.E.2d 944 on other grounds.

6. At 304 Ill.App. 607, 27 N.E.2d 67, 72.

7. 1943, 204 La. 896, 16 So.2d 471.

8. 1950, 149 Tex. 416, 234 S.W.2d 389.

rectional survey "in accordance with usages of courts [of] equity" where the trial court, after hearing testimony had found:

"(1) that *'there is probable cause to believe'* that the bore hole of petitioners' well has so deviated from the vertical that, at the points where it encountered the Marginulina sand at 5716 feet and the Frio sand at 6750 feet, the hole is within the subsurface of the Phillips tract; (2) that *'there is probable cause to believe'* that petitioners by permitting the bore hole of their well so to enter the subsurface of the Phillips tract have committed a trespass, and are committing a continuing trespass, upon the Phillips tract * * *." (Emphasis supplied.)

Although the California "slant-hole" cases are a little different in character from the case at bar, inasmuch as the problem there involved was one of controlled directional drilling coupled with a specific intent to reach known oil deposits underlying the land of others, the court has carefully analyzed each of the reported cases in an effort to draw some parallel with the fact situation in the case under consideration.[9] It is noteworthy that in each of

---

9. Although the question of intent is immaterial if in fact a trespass has resulted in conversion, the background and history of the California "whipstocking" cases doubtless was considered by the trial judges, along with other facts, when they determined that trespass was *probable* and thus ordered directional surveys. In the September, 1939, issue of The John Marshall Law Quarterly an article, written by Mortimer Kline, a California attorney, deals with the California problem of "crooked hole" drilling. This article reads in part:

"Operators possessing barren properties realized the huge dividends which could be reaped by so drilling their wells as to bottom within and produce from the rich deposits of their neighbors. Suddenly and without warning, an epidemic of "crooked" hole drilling occurred simultaneously throughout California. *The most intensive drilling campaign was commenced in what had been considered theretofore a non-productive area of the Signal Hill oil field.*

"Briefly we will focus upon that situation.

"Words are inadequate to depict the 'boom' which engulfed the locality. A forest of derricks was created with foundations almost in contact with one another. Oil well supply houses were deluged with orders for equipment. The field was a veritable beehive of activity, with crews feverishly working twenty-four hours a day. The office of the Corporation Commissioner of California was swamped with numerous applications for issuance of securities to be utilized for the purpose of raising funds to finance these projects. The gullible public, always willing to buy, 'invested' millions of dollars in the purchase of royalty interests from individuals and royalty concerns scattered throughout the country. This sudden activity was viewed with alarm by the oil companies owning valuable producing leases in the vicinity of these wells. Their engineers had advised that wells, if drilled vertically upon such adjacent lands, would produce large quantities of salt water. The area soon became known as the 'hot spot' or 'asbestos flat'.

"Warning notices were sent notifying the operators of suspected 'crooked holes' that they should not permit their wells during the drilling thereof, to trespass upon or penetrate the leases of their neighbors and should employ all reasonable means to prevent such trespass. This gesture must have been regarded with amusement by these operators who at the moment were burrowing into the fertile sands of those sending the notices. The drilling continued unabated, and within a period of a few months many wells were completed which produced oil at a rate consonant with wells located 'up-structure' and wholly inconsistent with their true position on the oil structure.

"Companies owning the 'up-structure' leases, such as the Shell Oil Company, Union Oil Company of California, The Texas Company, and a number of other companies, joined in a secret investigation. Special engineers were employed, and a special engineering office was established in the field. The area was under constant surveillance of field scouts. In a few weeks time a mass of information was collected. In some instances operators were found to be locking tubing and rods in wells for the purpose of preventing surveys. Such operations in-

these cases where directional surveys were ordered, trespass was *probable*.

In Union Oil v. Reconstruction Oil Co.[10] the defendants drilled the well some *60 feet* west from the southwest corner of plaintiff's lease. The original driller, defendant Marine Drilling Corporation, made an application to the commissioner of corporations for a permit to issue certificates of stock. The commissioner advised the defendant Marine Corporation that before such a permit could be issued the defendant Marine Corporation would have to file an affidavit to the effect that, "it was not the intention of the [Marine] corporation * * * to trespass upon or under neighboring premises". This affidavit was never filed and consequently the application was dropped. The drilling then proceeded under the supervision of a directional drilling expert; directional or deviational tools consisting of whipstocks, Lucey spud bits, and knuckle joints were employed for the purpose of changing the direction which the well was taking in the course of the drilling. Some 20 or 30 "single shot" surveys were made which showed that the well was off the vertical. There was even evidence that one of the dillers admitted that the defendants were under plaintliff's property, but that they wanted to get off and were trying so to do.

In Alphonzo E. Bell Corp. v. Bell View Oil Syndicate[11] the well was drilled on a tract of land 60 feet by 240 feet. In addition to other persuasive evidence, the plaintiffs produced testimony that a directional survey had previously been made of this very hole and that such survey disclosed that there had been a trespass upon the plaintiff's land.

In Union Oil Co. of California v. Mutual Oil Co.[12] the exact facts upon which the court relied in ordering a directional survey are not set out and consequently this case gives us little aid, other than to demonstrate the *power* of the court to order such a survey under appropriate circumstances. However, the trial court found that Mutual Oil Co. and certain other defendants were guilty of the allegation, "that the drilling of said well by said defendants was deliberately and intentionally controlled and managed as to course and direction thereof so that said well crossed within the boundary" of the plaintiffs' premises. Although *intention* to trespass is immaterial, if in fact a trespass has occurred, the proved intent to trespass implies that the court had facts before it which indicated a trespass was *probable* at the time the survey was ordered.[13]

■ Parenthetically, it may be mentioned that in the case at bar the defendant raises the point that inasmuch as the well in question was drilled in good faith in accordance with the best known practices, accepted and approved by the oil and gas industry generally at that time, that the granting of the requested order would lay down a dangerous precedent. The de-

---

variably took place in the early morning hours when we were supposedly asleep. * * *

"Suddenly and without warning, forty law suits were filed, each encompassing a single well. The initial effect of the filing of the legal actions was dramatic. A number of wells were abandoned, being plugged without the removal of tubing or pumping rods. Operators of more belligerent type, employed some method of locking of tubing or rods, or both, so as to prevent the making of subsurface surveys of their wells. * * *

"Operators of suspected wells furnished erroneous logs and reports to the California Mining Bureau and others falsified their drilling records, concealed use of deviational tools and otherwise made the task of discovery an arduous one. * * *

"It is difficult to estimate the amount of oil stolen by these crooked wells. It probably approximated a million dollars. It has been estimated that between four and five million dollars in money and property was lost as a result of these drilling operations." (Emphasis supplied.)

10. 1937, 20 Cal.App.2d 170, 66 P.2d 1215, 1217. Also, see 4 Cal.2d 541, 51 P.2d 81.

11. 1938, 24 Cal.App.2d 587, 76 P.2d 167.

12. 1937, 19 Cal.App.2d 409, 65 P.2d 896, 898.

13. See footnote 9, supra.

fendant emphasizes the fact that there are any number of "crooked holes" in and about the area here involved and that the issuing of this order would encourage "prospectors" to contract with landowners adjacent to all known "crooked . holes", thereafter bringing lawsuits, immediately demanding a directional survey, just on a mere chance that the off-vertical well be bottomed on the contracting landowner's property. Although such a practice may not be within the spirit of the rules of discovery, this court cannot concern itself with the possible far-reaching effect of a precedent which may be set regarding holes which are in fact bottomed on the land of another. If a trespass has been committed the legal rights of those against whom the trespass has taken place must be enforced.

It is elementary that if conversion has occurred that the good or bad faith of the trespassing one is immaterial;[14] thus if the adjoining landowner can show that there is a *probability* that his land has been invaded, intentionally or otherwise, under Rule 34 he is entitled to a survey to aid him in establishing that fact.

If there be merit to the contention that the companies, who in good faith drilled with reasonable care in conformity with the accepted standards of the time, are entitled to some special dispensation apart from the general law dealing with conversion and its Statute of Limitations, such consideration must come from the legislature, and not through the court by means of a twisting and distorting of well entrenched procedural and substantive principles of law.[15]

14. In the Union Oil Co. of California Case, cited in footnote 12, supra, 65 .P. 2d at page 898 the court said: " * : * * The question of whether the well was intentionally or unintentionally drilled so as to slant into plaintiffs' premises, is immaterial here. In either case a trespass was committed in the drilling of the well and the trial court further found 'that the maintenance of said Carpenter No. 1 Well and the production of petroleum therefrom constituted a con-' tinuing trespass' upon plaintiffs' premises. * * * Thus the appealing defendants were chargeable with trespass as well as conversion by reason of the acts of their agent, Mutual Oil Company, for 'neither good nor bad faith, neither care nor negligence, neither knowledge nor ignorance, are of the gist of the action.' [Citing cases.]"

In the Alphonzo E. Bell Corp. Case, cited in footnote 11, supra, 76 P.2d at page 173 the court said: "Again, the contention that it does not appear from the pleadings whether the wells were drilled in accordance with the generally accepted and prevailing art and drilling practice at the time the wells were drilled presents no logical basis upon which to found an argument that the complaint or pleadings filed by the interveners is defective. The mere fact that the drillers of other wells and the owners of adjoining properties may have so drilled their wells as to bottom the same where they had no right to lay the bottom of their wells, and extract oil that belonged to others, is no excuse what-

ever for the alleged actions of the defendants, if it be assumed that they drilled their wells and bottomed the same for the purpose of capturing oil, gas, and other hydrocarbons wherever the same could be obtained irrespective of the rights of adjoining owners. * * *" Accord, Gliptis v. Fifteen Oil Co., footnote 7 supra.

15. The California Legislature in 1935 enacted Sec. 349¾ of Cal.Code of Civ. Proc. which provides:

"Within one hundred eighty days: * * * (a) An action to enjoin, abate, or for damages on account of, an underground trespass, use or occupancy, by means of a well drilled for oil or gas or both from a surface location on land other than real property in which the aggrieved party has some right, title or interest or in respect to which the aggrieved party has some right, title or interest. (b) An action for conversion or for the taking or removing of oil, gas or other liquid, or fluids by means of any such well.

"When cause of action accrues. When any of said acts is by means of a new well the actual drilling of which is commenced after this section becomes effective, and such act was knowingly committed with actual intent to commit such act, the cause of action in such case shall not be deemed to have accrued until the discovery, by the aggrieved party, of the act or acts complained of; but in all other cases, and as to wells heretofore or hereafter drilled, the

As illustrated in the previously cited cases, when once the *probability* of trespass is shown, then the court is not only justified in ordering a temporary invasion of the property of a defendant, but it has the duty to so do. As aptly phrased by the United States Supreme Court in Montana Co. v. St. Louis Mining & Milling Co.[16]:

"\* \* \* To 'establish justice' is one of the objects of all social organizations, as well as one of the declared purposes of the federal constitution; and if, to determine the exact measure of the rights of parties, it is necessary that a temporary invasion of the possession of either for purposes of inspection be had, surely the lesser evil of. temporary invasion of one's possession should yield to the higher good of establishing justice; \* \* \*."

As to the likelihood of trespass it goes without saying that the court should not require that measure of proof which would be needed to *establish* the fact of trespass at a trial on the merits, since if such proof could be made there would be no need for the sought after evidence; however, there must be a showing of *probability* as distinguished from a *far removed possibility*.

We now turn to the case at bar. From the hearing the court finds the following facts:

(1) The well involved here, the Continental Oil Company's Munah Cosar No. 1, is located in the center of the SE/4 of SE/4 of SW/4 of Section 25, Township 8 North, Range 6 East, Seminole County, Oklahoma. This well is located at a point on the surface approximately 333 feet west and 330 feet north of the southwest corner of plaintiffs' 40 acres.

(2) The Munah Cosar well is located on a lease which since prior to 1928 has been owned by the defendant Continental Oil Company and the Fisher Oil Company.

(3) The Munah Cosar was drilled, completed and placed upon production in 1928. It has produced something over 700,000 barrels of oil and may reasonably be expected to produce an additional 100,000 barrels.

(4) The Little River field, in Seminole County, Oklahoma, in which the producing oil formation is the Wilcox Sand, was drilled and developed over twenty years ago. Many of its wells are still producing substantial quantities of oil. Interspersed throughout this field are dry holes, producing wells, and wells which originally produced but have since been abandoned because of declining production.

(5) The Munah Cosar well is producing from the producing structure known as the Little River field, although it is located upon the extreme northeastern flank, with the main body of the Little River field lying south and southwest of the Munah Cosar.

(6) Although the Munah Cosar was drilled in accordance with the accepted and approved practices of the oil industry, at the time, the bore hole is off-vertical. The hole has a measured depth of something over 150 feet more than the vertical depth of the producing formation beneath its surface location.

(7) If the Munah Cosar's vertical deviation were all in one direction, the horizontal displacement between the surface location and the bottom of the hole would be approximately 1000 feet. However, there is only a remote possibility that the vertical deviation was all in one direction. The

---

cause of action shall be deemed to have accrued ten days after the time when ; the well which is the subject of the cause of action was first placed on production.

"Only one cause of action. Notwithstanding the continuing character of any such act, there shall be but one cause of action for any such act, and the cause of action shall accrue as aforesaid."

The constitutionality of the retroactive element of this statute was expressly upheld in Standard Oil Co. of Calif. v. United States, 9 Cir., 107 F.2d 402, certiorari denied 309 U.S. 654, 697, 673, 60 S.Ct. 469, 84 L.Ed. 1003.

16. 1892, 162 U.S. 160, 14 S.Ct. 506, 508, 38 L.Ed. 398.

hole probably pursued an irregularly wandering course or took a gently spiralling course, and is bottomed at some point with a horizontal deflection from surface location of 500 feet or less. .

(8) At the time the Munah Cosar was drilled the Twin-States Oil Company drilled a well on plaintiffs' land in the center of the 10-acre tract lying immediately east of the 10-acre tract upon which the Munah Cosar is located. The Twin-States well produced about 60,000 barrels of oil during a three year period and was thereafter abandoned due to declining oil production and because of salt water encroachment. At the time it was abandoned it was producing about 10 barrels of oil daily.

(9) The plaintiffs herein, except Paul Williams, are the owners of the 40-acre tract immediately east of the Munah Cosar and upon which the Twin-States well was located, being the SW/4 of SE/4 of Section 25. Plaintiff, Paul S. Williams, has a contract with the owners of this 40 acres in which he has agreed to prosecute this action, paying all of the costs and expenses thereof, in consideration of ⅞ of any recovery obtained.

(10) Gulf Oil Corporation drilled a well, at approximately the same time the Munah Cosar and the Twin-States wells were drilled, on the 10-acre tract directly south from the Twin-States well. This Gulf well (the Wicey Cosar) has produced many thousands of barrels of oil and is still producing oil in substantial quantities along with comparatively little salt water.

(11) In a straight line extending due south of this Gulf well, and at regular 660-ft. intervals there are a number of wells which have produced substantial quantities of oil from the Wilcox sand. Some of these are still producing. This line of wells, which ends on the north at the abandoned Twin-States well, constitutes the eastern boundary of the Little River field.

(12) Within the past three years two dry holes have been drilled in the N/2 of the SE/4 of Section 25. These lie immediately north and east of the plaintiffs' 40-acres. The Wilson & Williams well was located in the SE/4 of NW/4 of SE/4, on the 40 acres directly to the north of plaintiffs' 40 acres; the Rycade & Williams well was located in the SE/4 of NE/4 of SE/4 on the 40 acres directly northeast from plaintiffs' 40 acres. Both of these wells were drilled to the Wilcox sand but neither produced oil in commercial quantities.

(13) There have been other dry holes drilled to the Wilcox sand at various times in the past to the north, to the northeast, to the east, and to the southeast, of plaintiffs' land.

(14) There is no convincing evidence, either on the surface of the ground, or based upon subsurface geological information or well performance, that there is an oil producing structure beneath the plaintiffs' land, or that such land is now, or ever has been, underlaid by recoverable oil in commercial quantities.

(15) The casing in the Munah Cosar is over twenty-four years old. The salt water production, which has a corrosive effect upon casing, tubing and rods, has gradually increased during the last twenty years; at this time the well is producing a substantial amount of salt water.

(16) To survey this well, the pump at the bottom of the hole must be unseated, the tubing and rods must be pulled out of the hole, a string of pipe (or tubing) with the surveying instrument attached must be run. To again place the well on production the tubing and rods must be re-run into the hole and the pump must be re-seated.

The theory behind the plaintiffs' claim is that the Munah Cosar well lies directly over a fault, and that the Munah Cosar is producing from a reservoir completely separate and apart from the Little River field; they contend that the well is producing from a structural high located some 1000 feet to the northeast of the surface location of the Munah Cosar, and that the center of the high is directly beneath plaintiffs' 40 acres; the plaintiffs' contend further that the 40-acre tract just north from plaintiffs' land and the 40-acre tract

to the northeast from plaintiffs' land are surfaced over this same reservoir of oil. This alleged reservoir, according to the testimony of Mr. Williams, expert witness, and one of the plaintiffs, originally contained some 4,800,000 barrels of recoverable oil.

The geology, seismography and engineering testimony submitted at the hearing is in decided conflict. There exists a wide divergence of opinion between the expert witnesses of the plaintiffs' and the defendant's. However, without analysing the testimony with particularity, certain uncontradicted facts appear to this court to be controlling.

The only well drilled on plaintiffs' 40 acres, the Twin-States well (see finding no. 9) which was located directly over the alleged highly productive reservoir produced *only* some 60,000 barrels of oil before being plugged; two other wells, one to the north, the other to the northeast of plaintiffs' land, which were also drilled directly over the alleged reservoir, utterly failed to produce oil in commercial quantities. In view of this the court is satisfied that no independent reservoir exists to the east and northeast of the Munah Cosar; and, it seems inconceivable to this court that the bore hole of the Munah Cosar wandered either to the east or northeast and converted some 700,000 barrels of oil from the very land where three other wells obtained a combined production of only something over 60,000 barrels.

The theory of the plaintiffs' is purely conjectural and speculative to the highest degree.

It must not be overlooked that in all cases, without exception, where courts in the past have ordered directional surveys, the plaintiffs were the owners of *productive* lands with known oil deposits. Thus the courts had before them various facts demonstrating probability of trespass, coupled with the unqualified fact that the plaintiffs had oil which could be the object of conversion.

Although not controlling, there is one other element which this court could not completely ignore in its rationale.

The cases uniformly agree that where a survey is ordered the complete risk and hazard, if any, must be borne by the plaintiff; the defendant cannot be submitted to possible loss. Without exception the plaintiff must post a bond sufficient to hold the defendant harmless.[17] In these other cases the bond was comparatively small inasmuch as for all practical purposes there was involved no risk to the well. The surveys were made on new wells; the age of these wells varied from a few months, wells not yet completed, to wells about three years old.

As pointed out (see finding No. 16) the casing in the Munah Cosar is over twenty-four years old. Although it is unlikely that any injury would result from the proposed survey, there is some hazard and risk. If the casing should break or collapse, or if equipment should be lost in the hole, it is probable that the Munah Cosar could not again be placed upon production. Should this happen, in addition to the cost of drilling, completing and equipping a new well, the recoveries of oil from such new well would be substantially less than the anticipated production of the Munah Cosar of 100,000 barrels (see finding No. 3).

17. In the Gliptis case, footnote 7 supra, 16 So.2d at page 481 the court said: " * * * Of course, a defendant who is required to surrender his well for the purpose of having it surveyed by experts appointed by the court is entitled to protection against such loss and damage as may reasonably be expected to result from such survey. * * * If the survey is made, it will be made not at the risk of defendant, but at the risk of plaintiff, who must pay all costs thereof and provide ample safeguard to protect defendant's rights."

In the Texas Co. case, footnote 5 supra, 27 N.E.2d at page 74 the court said: " * * * Should defendants fail or refuse to answer said petition, then the court shall allow said petition and order a directional subsurface survey under the direction of the court after exacting from petitioner ample safeguards for the protection of defendants' rights and their security * * *."

Naturally, as it becomes more improbable that a defendant has been guilty of a trespass, the court should be more sensitive to the possible hardship and risk to which the defendant is to be submitted.

For the court to be justified in ordering a directional survey under the facts in this case, Rule 34 must unqualifiedly stand for the legal proposition that, "all landowners in the general vicinity of a well known to be off-vertical can as a matter of right, without further proof, demand a survey, regardless how improbable it be that a subsurface trespass has ensued." The court is cognizant of and in complete harmony with the liberal spirit imbued in the Federal Rules of Civil Procedure;[18] however, discovery does not go this far.

Motion for directional survey denied.

See also D.C., 106 F.Supp. 316.

18. "Rule 34 is to be liberally, rather than narrowly construed and its provisions have the force and effect of a statute."

2 Barron & Holtzoff, Fed.Prac. and Proc., 485, Sec. 792.