**WILLIAMS et al.**

v.

**CONTINENTAL OIL CO.**

No. 4819.

United States Court of Appeals
Tenth Circuit.

Aug. 19, 1954.

Rehearing Denied Sept. 22, 1954.

Phillips, Chief Judge, dissented.

Duke Duvall, Oklahoma City, Okl., and A. G. C. Bierer, Jr., Guthrie, Okl. (G. O. Wallace, Wewoka, Okl., was with them on the brief), for appellants.

Richard W. Fowler, Oklahoma City, Okl. (Richard R. Linn, Oklahoma City, Okl., and R. O. Wilson, Ponca City, Okl., were with him on the brief), for appellee.

Before PHILLIPS, Chief Judge, and BRATTON and MURRAH, Circuit Judges.

BRATTON, Circuit Judge.

The only question necessary to be determined on this appeal is whether the trial court erred in refusing to enter an order under Rule of Civil Procedure 34, 28 U.S.C., requiring the defendant to permit the making of a deviational and directional survey of an oil and gas well belonging to the defendant for the purpose of ascertaining whether the underground terminus of the well is in the subsurface of a tract of land belonging to plaintiffs.

Paul S. Williams and others instituted the action against Continental Oil Company to recover damages for alleged underground trespass. Later, Fisher Oil Company was joined as a party defendant but it was subsequently eliminated from the case and no further reference will be made to it. Plaintiffs in composite own a certain tract of land and the mineral interests therein in Seminole County, Oklahoma. In 1928, the defendant drilled the Munnah Cosar Well No. 1 on a tract of land adjoining the land owned by plaintiffs. The well is located approximately 330 feet west and 330 feet north from the southwest corner of the land belonging to plaintiffs. The cause of action pleaded in the amended complaint was that as the well was being drilled it deviated from the vertical, went across the boundary line of plaintiffs' land, and extended into an oil bearing stratum known as the Wilcox Sand underneath plaintiffs' land; that by the operation of the well, the defendant had been drawing from plaintiffs' land oil, gas, and hydrocarbons; and that the defendant had converted and appropriated unto itself oil and gas belonging to plaintiffs. In the amended complaint, plaintiffs sought an accounting and, as incidental relief in the nature of discovery, an order requiring defendant to permit the making of a deviational and directional survey of the well. The defendant denied many of the material allegations contained in the amended complaint and pleaded limitations and laches.

The cause came on for hearing upon the application of plaintiffs for an order requiring the defendant to permit the making of the survey. At the beginning of the hearing, plaintiffs made an offer in open court. The substance of the offer was that the survey be made under the direction and supervision of the court; that it be made by a company of the court's own choice; that each party be given the privilege of having an expert representative present when the survey was made; that the report of the survey be made directly to the court; that plaintiffs advance the expense of the making of the survey, such expense to be later taxed as costs; that plaintiff file in the cause a reasonable bond to protect the defendant against any damage which might be done to the well in connection with the making of the survey; that the bond include protection against loss by virtue of the well being out of production during the making of the survey; and that plaintiffs would dismiss the action with prejudice if the report of the survey failed to show that the bottom of the hole was in the subsurface of the land belonging to plaintiffs. Defendant rejected the offer and in effect objected per se to the survey being made regardless of any offer which plaintiffs might make in connection therewith. The hearing was extended. The evidence covers more than 600 typed pages in the record. Findings of fact were made and an exhaustive opinion was delivered. The court proceeded upon the premise that such a survey would furnish competent and material evidence for use when the case came on for trial on its merits; that such a survey would greatly aid plaintiffs in the preparation of their case for trial; and that it was the only means by which it could be determined with certainty whether the well was bottomed in the subsurface of the land belonging to plaintiffs. But the court expressed the view that there was only a remote possibility that the deviation of the well was all in one direction, and that the

hole probably pursued a wandering or gently spiraling course and is bottomed at a point with a horizontal deflection from the surface location of 500 feet or less. The court noted its recognition of the fact that the geological, seismographical, and engineering testimony submitted at the hearing was in decided conflict, and that there existed a wide divergence of opinion among the expert witnesses. But the court expressed the conviction that there was no convincing evidence that there was an oil producing structure beneath plaintiffs' land, or that such land ever had been underlaid by recoverable oil in commercial quantities. And the court concluded that plaintiffs' theory of the case was purely conjectural and speculative to the highest degree and did not justify the hazard incident to the making of the survey. Accordingly the court declined to order the making of the survey, 14 F.R.D. 58.

Several months after entry of the order refusing the application for the making of the survey, the case came on for trial on its merits. A jury was impaneled but there was no formal trial. By agreement of the parties, a transcript of the proceedings had on the hearing upon the application for the order for the making of the survey was introduced in evidence, and a token of additional evidence was introduced. The court directed a verdict for the defendant; judgment was entered accordingly; and plaintiffs appealed. After the appeal was perfected, plaintiff Paul S. Williams died and Cordelia Pearl Williams, successor in interest of the decedent, was substituted as party appellant. For convenience, continued reference will be made to the parties as plaintiffs and defendant, respectively.

■ It is not inappropriate to observe that the question whether a court of equity has the power to order the making of a deviational and directional survey in a case of this kind, as well as the question whether such a survey should be ordered in the varying circumstances presented, is not new. The power of the court to order the making of a survey of

the kind sought here has been enunciated and the correctness of such an order has been upheld in certain cases in state courts. Union Oil Company of California v. Reconstruction Oil Co., 4 Cal.2d 541, 51 P.2d 81; Gliptis v. Fifteen Oil Co., 204 La. 896, 16 So.2d 471; Hastings Oil Co. v. Texas Co., 149 Tex. 416, 234 S.W.2d 389; Texas Co. v. Hollingsworth, 304 Ill.App. 607, 27 N.E.2d 67, reversed for absence of necessary parties, 375 Ill. 536, 31 N.E.2d 944. These cases are not controlling, but they do articulate with some persuasion the general direction to which the appropriate exertion of the court's discretion points.

Rule of Civil Procedure 34 provides in presently material part that upon the motion of any party showing good cause therefor and upon notice to all other parties, and subject to the provisions of Rule 30(b), the court in which an action is pending may order any party to permit entry upon designated land or other property in his possession for the purpose of surveying the property or any designated object or operation thereon within the scope of the examination permitted by Rule 26(b); and that the order may prescribe such terms and conditions as are just. In a case of this kind which necessarily turns upon the location of the bottom of an oil and gas well, the court has power under the rule to order the making of a deviational and directional survey. Humble Oil & Refining Co. v. Sun Oil Co., 5 Cir., 175 F.2d 670. But the moving party is not entitled as a matter of right to an order for the making of such a survey. Under the rule, it is incumbent upon the party applying for the order to make a showing of good cause. Hickman v. Taylor, 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451; Martin v. Capital Transit Co., 83 U.S.App.D.C. 239, 170 F.2d 811; Safeway Stores v. Reynolds, 85 U.S.App.D.C. 194, 176 F.2d 476; Alltmont v. United States, 3 Cir., 177 F. 2d 971, certiorari denied, 339 U.S. 967, 70 S.Ct. 999, 94 L.Ed. 1375.

■■ No abstract rule of thumb has been devised for ready use in determining in every case whether good cause has

been shown. In each case the question is whether special circumstances make it essential to the preparation of the moving party's case that the desired information be made available to him. And in appraising for that purpose the circumstances in a particular case, the trial court is vested with a reasonable range of discretion to be exercised with due regard for the interests and equities of the parties. Hickman v. Taylor, supra; Reynolds v. United States, 3 Cir., 192 F. 2d 987, reversed on another ground, 345 U.S. 1, 73 S.Ct. 528, 97 L.Ed. 727. The trial court was not unmindful of these principles, and the defendant concedes them. The denial of the order for the making of the survey was predicated upon the basis that plaintiffs failed to show good cause, and the defendant seeks to sustain the order on that ground.

With these generalizations in mind, we come to consider whether plaintiffs discharged the burden resting upon them to show good cause for the requested order for the making of the survey of the well and whether the request was improvidently denied. The well was drilled in the usual manner and in accordance with the accepted practices obtaining at the time. At the time of the hearing, the well had produced more than 700,000 barrels of oil, and its future production was estimated to be 100,000 barrels. There was no intention or effort to drill a crooked hole. But the hole was crooked. The defendant learned that fact while the well was being drilled. Shortly after the completion of the well, the defendant caused to be made a deviational examination or survey of the hole but not a directional survey. The examination was made by means of a device known in the oil producing industry as an acid bottle inclinometer and it showed that the well was crooked but did not disclose the compass direction of the deviation from the vertical. It disclosed facts from which it could be determined that if the vertical deviation were all in one direction, the horizontal displacement between the surface location and the underground terminus of the hole would be about 1,000 feet. After the filing of the suit and before the hearing upon the application for the order for the making of the directional survey, the defendant made a second deviational test, but not a directional survey, with the acid bottle inclinometer; and it confirmed in substantial respects the facts developed on the first test. Evidence was introduced respecting the location, depth, and productive history as to oil and water of the well in question and other wells in the area. Some of the evidence consisted of official records, logs, maps, geological data, seismographical data, geophysical data, and other pertinent data. And geologists, seismographers, petroleum engineers, and others experienced in the oil industry testified as experts. The testimony of the expert witnesses was in great detail and it presented points of complete agreement and points of irreconcilable difference. In the main, the expert witnesses testifying for plaintiffs and those testifying for the defendant were sharply opposed to each other in respect to whether the land belonging to plaintiffs was underlaid by recoverable oil in commercial quantities and whether the underground terminus of the well was beneath the surface of the land belonging to plaintiffs. In reaching their respective conclusions, the witnesses took into consideration and gave what they deemed to be appropriate weight to various factors. Some of the witnesses testifying for plaintiffs expressed the opinion that the land belonging to plaintiffs was underlaid by recoverable oil in commercial quantities; and some expressed the opinion that when the hole deviated from the vertical it started in the general direction of plaintiffs' land, continued in that general direction, and extended to a point of terminus underneath land of plaintiffs. On the other hand, some of the expert witnesses testifying for the defendant expressed the opinion that there was no oil in commercial quantities underneath the land of plaintiffs; and some expressed the opinion that when the hole deviated from the vertical, it pursued a wandering or spiraling course and did

not get far enough from the vertical below the surface of the hole to reach any point underneath the land belonging to plaintiffs. Much of the testimony of the expert witnesses was in substance interpretations and conclusions based upon physical facts and available data. Some of the conflict among such witnesses lay in part to their respective views as to whether the well in question was producing from the old reservoir underlying the Little River Oil Field or from a separate and distinct reservoir underlying plaintiffs' land. There was evidence that a directional survey is the recognized and accepted method of ascertaining with certainty the direction taken by a crooked hole of an oil well; that the procedure for making such a survey is to pull the rod and tubing from the hole, insert in or attach to the bottom of the tubing the device or mechanism, put the tubing back into the hole the full length so that the device or mechanism is at the bottom of the hole, pull out the tubing again, remove the device or mechanism, and then return the rod and tubing to their proper position in the hole for operation purposes; that the making of the survey would not damage the well; that the survey could be made within twenty-four hours or less; and that the cost would be approximately $1,000. The witness who testified to these facts said that he had been employed by one of the two companies engaged in the making of such surveys; that he had made or was connected with the making of several hundred such surveys in the mid-continent area and in two foreign countries; that there was nothing about the making of such a survey which involved extraordinary risk of injury or damage to the well; and that he did not know of a single instance where a well had sustained any such injury. A witness for the defendant, with experience in the oil producing business but none in the making of directional surveys, testified that in view of the age of the casing in the well he thought there was some danger of the casing giving way during the making of the test; that in

such event, the drilling of a new well might be the only corrective procedure; and that there was a possibility that the new well would not produce as much oil as was expected from the old well. But there was no testimony of a single instance in which a well had sustained substantial injury or damage arising out of the making of such a survey. Viewed in its entirety, the evidence left in the realm of inference or probabilities the ultimate question whether the underground terminus of the hole was underneath the land belonging to plaintiffs. Plaintiffs offered in substantial quantity testimony of experts that in their considered opinion the hole was bottomed in the subsurface of plaintiffs' land. That was the best kind of evidence which was available to plaintiffs. But it was not enough to take the crucial question of fact out of the field of inference or probabilities. There was one method—and only one—known to those engaged in the business by which it could be determined with certainty and sureness the exact location of the underground terminus of the hole. That method was and is the making of a directional survey. The making of the survey and the use of the report thereof as evidence was not only a convenient means of proving or disproving the crucial fact essential to the right of plaintiffs to recover, it was the only way to prove or disprove such fact with sufficient certainty to remove it from the field of inference and probabilities. This was not an instance in which plaintiffs by means of other evidence could have established with the required measure of certainty the fact that the well was bottomed underneath their land. Neither was it an instance of the desired survey being cumulative of other available procedure to establish such fact. Without the making of such a survey, plaintiffs can never secure an adjudication of the critical issue in the case, based upon a foundation which is certain and sure. When the evidence is viewed in its entirety, we think that good cause for the making of the survey was shown and that an

order should have been entered for its making, upon reasonable terms and conditions prescribed by the court.

The judgment is reversed and the cause remanded with directions to enter an order for the making of the deviational and directional survey, and for further proceedings thereafter.

PHILLIPS, Chief Judge (dissenting).

Rule 34 of the Federal Rules of Civil Procedure imposes as a condition to the granting of relief thereunder that good cause be shown therefor. The plaintiffs below, other than Paul S. Williams, are the owners of the SW¼ of the SE¼ of S. 25, T. 8 N., R. 6 E. The Continental Oil Company is the owner of Munnah Cosar Well No. 1. The surface point of the well is located 330 feet north of the section line between Sections 25 and 36, and 333 feet west of the boundary line between the SE¼ of the SW¼ and the SW¼ of the SE¼ of Section 25. The well has produced in excess of 700,000 barrels of oil and it is estimated that it will produce an additional 100,000 barrels of oil. The plaintiffs below sought an order for a directional survey of the well for the purpose of determining whether it is bottomed in the SW¼ of the SE¼ of Section 25. After a very full hearing, the trial court concluded that the plaintiffs below had failed to show good cause for such survey.

It is my opinion that in determining whether good cause has been shown, the district court is necessarily vested with a wide discretion, and that its determination of such question should not be disturbed, in the absence of a showing of a clear abuse of discretion.

Here, the trial court concluded, and, I think, correctly, that the geological facts disclosed by the drilling of other oil and gas wells in the area, including a non-commercial producer drilled in the SW¼ of the SE¼ of Section 25, and other indisputable physical facts established by the evidence showed that the presence of oil bearing strata in the SW¼ of the SE¼ of Section 25 was, at most, a very remote possibility. Since Munnah Cosar Well No. 1 had been and still is a very large producer of oil, it followed that the possibility that such well was bottomed in the SW¼ of the SE¼ of Section 25 was likewise a very remote possibility.

At most, plaintiffs' efforts were in the category of what is commonly characterized as a "fishing expedition," which should not be countenanced.

Moreover, the evidence established that the making of such directional survey might result in damage to the well and could cause the loss of the well and the bond which the plaintiffs offered to furnish was so conditioned that it would not have afforded full protection to Continental Oil Company.

For the reasons indicated, I would affirm the judgment below.