ARK. STATE HIGHWAY COMMISSION *v.* STANLEY.

5-2510                                      353 S. W. 2d 173

Opinion delivered January 8, 1962.

[Rehearing denied February 19, 1962.]

*Dowell Anders* and *Paul Johnson,* for appellant.

*J. B. Milham, Kenneth C. Coffelt* and *Ben M. Mc-Cray,* for appellee.

GEORGE ROSE SMITH, J. The appellees, Marshall Stanley and his wife, owned a rectangular tract of about 67 acres in Saline county. This is an action by the highway commission to condemn 18.03 acres for a 350-foot right of way running diagonally across the Stanleys' land. After the taking the landowners will be left with two triangular parcels, one of about eight acres lying northwest of the new highway and the other of about 41 acres lying southeast of it.

This appeal questions a verdict and judgment awarding the appellees $150,000 for the 18.03 acres. For reversal the commission contends that the verdict is not supported by substantial competent evidence and that the trial court erred in refusing to permit the condemnor to make exploratory drilling tests upon that part of the land not being taken. We are of the opinion that the commission is right in both contentions.

Stanley testified that he bought the land in 1943 for about $8.00 an acre. The tax assessor testified that the 1960 assessment of the entire 67 acres, at 20 per cent of its value, was $440, indicating a worth of about $32.50 an acre. One of the appellees' witnesses, a real estate dealer, valued the land, apart from its minerals, at $200 an acre, or $3,600 for the parcel being taken. The highway commission offered the testimony of two real estate appraisers; one fixed the value of the 18.03 acres at $3,500, the other at $3,750.

The verdict of $150,000 finds the land being condemned to be worth about $8,320 an acre. The appellees insist that this figure is supported by testimony tending to show that the tract contains valuable mineral deposits.

Two kinds of minerals have been found within the tract and extracted commercially. The first, referred to as white gravel, is used in surfacing driveways and

walks. Drilling tests indicate that the tract contains 34,966 cubic yards of this gravel. Stanley has been selling it since 1943 for $2.00 a yard. His loading and severance tax expense is 15¢ a yard, leaving a return of $1.85 for the gravel.

The second mineral is a fairly pure mixture of sand and gravel that can be used as the aggregate in the manufacture of concrete. Concrete that is made from this aggregate, with cement and water, is suitable for the production of septic tanks, grease traps, and well tile. The appellees' tests indicate that the tract contains 241,759 cubic yards of this concrete aggregate.

The appellees relied upon three witnesses in their attempt to establish the value of the mineral deposits. Stanley himself described the physical characteristics of the land and recounted his experience in selling white gravel. He said that in seventeen years he had made from 100 to 150 sales in the Benton area. That would be a sale about every six weeks. The average volume of each sale is not shown. Stanley also explained the process by which he used the aggregate in the manufacture of septic tanks, grease traps, and well tile. He gave the yield from a yard of raw material and the selling prices for the finished products. This information, however, could not have been of any help to the jury, for there is no testimony about such essential factors as the cost of the cement, the labor expense, and the volume of sales.

After this introductory testimony Stanley stated that in his opinion the tract taken is worth twenty million dollars. This figure is arbitrary in that it has no relation whatever to any fact in the record. Stanley made no effort to say how he arrived at his valuation; it seems to have been plucked from the air and might equally well have been ten thousand dollars or a hundred million dollars. Even the opinion of an expert in the field of land valuation is not substantial evidence if he fails to show a fair or reasonable basis for his conclusion. *Ark. State Highway Comm.* v. *Byars,* 221 Ark. 845, 256 S. W. 2d 738. There is still less reason for finding the fanciful

figure fixed by Stanley to be a sufficient foundation for the verdict in this case.

The appellees' other two valuation witnesses were allowed to arrive at an opinion by multiplying the number of yards of each material by a fixed unit price. The witness Kimzey, a retired geologist not possessing any demonstrated expert knowledge of values, testified that 300,000 yards of concrete aggregate, at $5.00 a yard, would be worth $1,500,000; that 34,966 yards of white gravel, at $1.85 a yard, would be worth $64,687.10; and that these figures, when added to a land value of $3,600.00, produced a total valuation of $1,568,287.10. The third witness, a real estate broker, used a similar method of computation in arriving at a valuation of $2,311,347.00.

The practice of determining value by multiplying the number of yards or tons of material by a unit price has, as Orgel points out, been uniformly rejected by the courts. Orgel, Valuation Under Eminent Domain (2d Ed.), § 165; Nichols on Eminent Domain (3d Ed.), § 13.22. Well-reasoned decisions include *United States v. 620 Acres,* D. C. Ark., 101 F. Supp. 686; *United States v. 765.56 Acres,* D. C. N. Y., 174 F. Supp. 1; *Hoy v. Kansas Turnpike Authority,* 184 Kan. 70, 334 P. 2d 315; *Gulf Interstate Gas Co.* v. *Garvin,* Ky., 303 S. W. 2d 260; *State* v. *Mottman Merc. Co.,* 51 Wash. 722, 321 P. 2d 912.

We had occasion to touch upon the rule in *Ark. State Highway Comm.* v. *Cochran,* 230 Ark. 881, 327 S. W. 2d 733, where we said: "As a general rule the market value of a tract of land cannot be determined simply by estimating the amount of stone or other mineral that it contains and then multiplying that estimate by a fixed price per unit."

The exclusionary principle is plainly sound. The ultimate question for the jury is the market value of the land, the price that would be agreed upon by a willing buyer and a willing seller in a transaction at arm's length. The mechanical process of assigning a retail

value to every yard of mineral within the earth does not carry the jury beyond the realm of guesswork. That narrow formula fails to take into account vital considerations such as the cost of excavating the material, the cost of processing it, overhead expenses, the market for the finished product, and so on. In the case at bar the jury had almost no information about these matters. If the jurors had assumed without proof that an average order for white gravel for a driveway was, say, ten cubic yards, they might readily have determined that it would take Stanley almost 400 years to sell the deposits in the tract if the demand continued at the same rate as in the past. Obviously no purchaser would pay full retail value for the gravel in place in order to hold it for decades or centuries before recovering his investment. But what would he pay? The appellees' proof left the jury without the facts needed for an answer to this question.

We are cited principally to our decision in *City of Little Rock* v. *Moreland*, 231 Ark. 996, 334 S. W. 2d 229, where we upheld a finding that a tract of land in Pulaski county, containing bloating clay that could be used in the manufacture of a lightweight concrete aggregate, had a fair market value of about $181 an acre. There is little resemblance between that case and this one. There, as the opinions indicate, the litigants produced the best expert testimony that could be found, the judgment of men engaged in the business with actual experience in the matter of locating and constructing new plants for the production of lightweight aggregate. They had familiarized themselves with the pertinent considerations, such as the cost of erecting and operating a plant, the amount of the finished product that the market available to a Pulaski county plant could be expected to absorb, the availability of mineral deposits in addition to those within the land being condemned, and the competition to be expected from other building materials. The final decree in that case rested upon comprehensive proof of a substantial nature. Similar evidence is not to be found in the present record.

The second issue is the matter of discovery. Before the trial the highway commission, having been refused access to that part of the appellees' land not being condemned, applied to the court for an order permitting it to enter this land and make test drillings for the purpose of determining the extent of the mineral deposits therein. In response to this motion the appellees waived their claim to severance damages and used that waiver as a basis for contending that the condemnor was not entitled to explore the rest of their land. The court sustained the landowners' position and entered an order declaring that no proof would be received concerning the physical characteristics of the land not being taken.

This was error. Our discovery statute provides: "Upon motion of any party showing good cause therefor . . . the court in which an action is pending may . . . order any party to permit entry upon designated land or other property in his possession or control for the purpose of inspecting, measuring, surveying, or photographing the property or any designated object or operation thereon." Ark. Stats. 1947, § 28-356.

The language of this statute was taken verbatim from Federal Rule 34. It follows that our legislature, in adopting the wording of the federal rule, also adopted the principle of liberal construction that had been announced in the leading case of *Hickman* v. *Taylor*, 329 U. S. 495, 91 L. Ed. 451, 67 S. Ct. 385: "We agree, of course, that the deposition-discovery rules are to be accorded a broad and liberal treatment. No longer can the time-honored cry of 'fishing expedition' serve to preclude a party from inquiring into the facts underlying his opponent's case. Mutual knowledge of all the relevant facts gathered by both parties is essential to proper litigation. To that end, either party may compel the other to disgorge whatever facts he has in his possession."

The discovery provision authorizing an entry upon land is to be liberally construed. *United States* v. *Nat. Steel Corp.*, D. C. Tex., 26 F. R. D. 603. The extent to

which a discovery order may go is well illustrated by the holding in *Williams* v. *Continental Oil Co.*, 10th Cir., 215 F. 2d 4, cert. den. 348 U. S. 928, 99 L. ed. 728, 75 S. Ct. 341. The question was whether the defendant's oil well had been drilled so far off the perpendicular as to invade the plaintiff's land. The trial court refused to allow the plaintiff to enter the land and made a directional survey, which would involve unseating the pump at the bottom of the well and pulling out all the tubing, with some danger to the future productivity of the well. 14 F. R. D. 58. The court of appeals reversed this order and permitted the survey, reasoning that good cause had been shown simply because if the plaintiff could not obtain the desired information by means of the requested survey it could not be obtained at all. The possibility that the well might be damaged was met by the requirement of an indemnity bond.

In the granting or refusal of an order for discovery the two controlling considerations are relevancy and good cause. Barron & Holtzoff, Federal Practice and Procedure (1961), § 793. Here it is plain that the appellees' waiver of severance damages did not destroy the relevancy of the information sought by the highway commission. Severance damages are compensation for the landowner's loss in having his property cut in two. With those damages out of the case the remaining issue is the market value of the tract being taken. If the existence of other nearby mineral deposits has any relevancy to the question of market value then the disclaimer of severance damages is not a bar to the commission's right to discovery.

It can hardly be seriously denied that the market value of lands containing non-precious minerals such as this white gravel and concrete aggregate is directly affected by the abundance or scarcity of similar deposits in the vicinity. If the appellees owned the only such deposits in Saline county they would evidently be in a position to demand a better price for their land than would be the case if the minerals could be found almost

anywhere in the county. Consequently it is important for the condemnor to be in a position to prove the existence of other deposits. Specifically, if it should be found that the rest of the appellees' land contains more white gravel and concrete aggregate than they can be expected to sell in the indefinite future, that fact directly affects the market value of the tract being taken and is a proper matter for the jury's consideration.

Good cause for the discovery order exists. The statute provides that the court may permit an entry upon a party's land for the purpose of inspection. There is no practical way to inspect minerals in place except by such test drilling as both parties have already engaged in upon the tract being condemned. The exploratory holes appear to be three inches in diameter and are refilled immediately, so that there is no suggestion of any injury to the land. We are therefore of the opinion that the highway commission is entitled, at a reasonable time in advance of a retrial, to an order permitting it to enter upon the land for the purpose of ascertaining the extent of mineral deposits therein. Of course the commission may be required to give a bond if the landowners undertake to show, as they have not yet done, that the drilling may damage the land.

Reversed and remanded for a new trial.

BOHLINGER, J., not participating.

ED. F. McFADDIN, Associate Justice, concurring in part; and dissenting in part. The Majority Opinion decides two issues. The first issue relates to the judgment of $150,000.00 to the landowners; and I agree with the Majority that this judgment should be reversed. This will be further mentioned in Topic I, *infra*.

The second issue decided by the Majority relates to the refusal of the Trial Court to allow the Highway Commission to make exploratory drilling tests on lands owned by the Stanleys adjacent to the lands taken. The Majority holds that the Circuit Court was in error in refusing the Highway Commission's request; and I dis-

sent on this second issue because I am of the opinion that the Circuit Court ruling should not be disturbed on this point. This will be discussed in Topic II, *infra*.

I. *Admission Of Incompetent Evidence As To Value Of Land.* I agree with the Majority that the judgment in this case must be reversed because of the admission of incompetent evidence as to the value of the land. The landowners undertook to show: (a) the number of cubic yards and the net dollar value of the white gravel on the land taken; (b) the number of cubic yards and the net dollar value of the concrete aggregate on the tract; and (c) the value of the tract of 18.03 acres as ordinary land. These three items were then totaled to show the landowners' claims for damages. In 156 American Law Reports 1416, there is an annotation entitled: "Determination in eminent domain proceedings of market value of land as affected by mineral deposits or similar conditions"; and the holdings[1] all over the country as to the basic rule are summarized:

"With remarkable unanimity the courts hold that in determining the compensation in eminent domain proceedings for the land to be condemned, the existence of valuable mineral deposits in the land taken constitutes an element which may be taken into consideration if and insofar as it influences the market value of the land. The reason for this rule is that the measure of compensation in eminent domain proceedings is the market value of the land to be condemned as a whole with due consideration of all the components that make for its value. This rule has been expressed in a great number of decisions and has also been recognized by all the leading textwriters on this subject. It has been applied indiscrim-

---

[1] See in general 18 Am. Jur. 878, "Eminent Domain" § 242; and compare also 2 Lewis, "Eminent Domain", 3d ed. p. 1267, § 724; 1 Nichols, "Eminent Domain" 2d ed. p. 692, § 226; Orgel, "Valuation under the Law of Eminent Domain," 1936 ed. p. 541, § 164; Schmutz, "Condemnation Appraisers Handbook," 1938 ed. 65. There is a more recent—*i.e.*, second-edition of Orgel on "Valuation Under Eminent Domain"; and the citation in that edition is Vol. 1, p. 672, § 165. Also, there is an annotation in Vol. 100 Law Edition of U. S. Sup. Ct. Reports, p. 256, entitled, "Measure of damages payable on condemnation of real property by federal government—Supreme Court Cases."

inately to all forms of mineral deposits, such as limestone, ore, gold, fire clay, coal, sand and gravel, and stone. Occasionally the rule has been expressed by the negative statement that *the award may not be reached by separately evaluating the land and the deposits, since the latter, being only one element among many in determining the market value of the land, cannot be considered as an independent factor the value of which is to be simply added to the value of the land.''* (Emphasis supplied.)

The landowners could have shown the various mineral deposits as circumstances to be considered if and insofar as they influenced the market value of the land, but could not—as was done in this case—separately evaluate the deposits and then total the separate valuations to determine the value of the land. The question was the market value of land having such deposits, and the independent factors of minerals do not, in themselves, determine market value. So the landowners' entire approach to the determination of value was erroneous.

II. *Drilling Holes On Property Not Involved In This Action.* It is from the Majority holding on this point that I dissent. The Highway Commission condemned a tract of 18.03 acres. The landowners (appellees) waived all severance damages, and only sought recovery for the lands actually taken. The question was thus narrowed to the value of the 18.03 acres. *Lazenby* v. *Ark. Hwy. Comm.,* 231 Ark. 601, 331 S. W. 2d 705.

The landowners (appellees) claimed that the land taken contained valuable clay and gravel deposits; and the Highway Commission (appellant) sought a court order to be allowed to drill holes on *other* lands of the landowners, being lands adjacent to the lands taken. The Trial Court conducted a hearing on the motion, at which hearing the Highway Commission offered the witness Robert B. McElwaine, who testified:

''As far as what I would want to do, it is my opinion that it would be impossible on mineral deposits of this

type to evaluate the property being taken without knowing about the rest of the mineral deposit involved, not only on that tract, but in the remainder of the tract. I would propose to go onto the remaining properties, make a topographical survey, map and lay out, drill holes from which samples would be taken and tests performed and from that arrive at the amount of minerals on the whole tract in order to arrive at the amount of valuation of the minerals being taken.''

And, on cross-examination of the same witness, the following occurred:

''Q. Did I understand you to say that you could not determine the value of that mineral unless you knew what deposits were in the community, the land laying around it?

A. That is right.

Q. Does that include the land of other land owners?

A. In so far as it is possible to evaluate it, yes.

Q. Doesn't include the other land owners in that area?

A. It would include the right of way up and down the highway there, and if I had all the information I would like to have, yes.

Q. In order to take your testimony outside of the speculative realm you would have to have the knowledge of a considerable portion of the land in that community?

A. This is the focal point right here. I would like to examine the other land, but I would not go into so much work and drill on it as I would the focal point.

Q. I understand the Stanleys own sixty-eight acres and this right of way runs across the whole business; if it was necessary to drill their land to ascertain what the value of the property was in the right of way proper, I can't understand why you would have to have the information from the other lands.

A. The more we observe from the focal point we may want to go on the other lands to obtain some more detailed information.

Q. How would you do that?

A. I would endeavor to get the permission of the land owners."

The foregoing excerpts constitute a reasonable summary of the testimony of this witness—the only witness offered by the Highway Commission in support of its motion—and from this testimony the Trial Court' concluded that it would not make an order allowing the Highway Commission to go on the landowners' private property and drill holes. The Majority Opinion says that the Trial Court committed reversible error, and cites § 28-356 Ark. Stats., which is a copy of Federal Rule No. 34. I desire to defend the ruling of the Trial Court under three headings:

(a) *"Good Cause."* Our statute says, "Upon motion of any party showing good cause . . ." Good cause necessarily implies reasonable diligence on the part of the movant, and inability to obtain the desired evidence in any other method. The cases cited by the Majority so state.[2] In the case at bar, the Highway Commission's witness said that it might be necessary to drill on the lands of other landowners, and yet no effort had been made to accomplish that drilling. If similar clay and gravel deposits existed elsewhere than on the lands of these appellees, then the abundance of such deposits could easily have been shown without damaging

---

[2] For instance, in *Williams* v. *Continental Oil Co.*, 215 F. (2d) 4, the Court said: "The making of the survey and the use of the report thereof as evidence was not only a convenient means of proving or disproving the crucial fact essential to the right of plaintiff's to recover, it was the only way to prove or disprove such fact with sufficient certainty to remove it from the field of inference and probabilities. This was not an instance in which plaintiffs by means of other evidence could have established with the required measure of certainty the fact that the well was bottomed underneath their land. Neither was it an instance of the desired survey being cumulative of other available procedure to establish such fact. Without the making of such a survey, plaintiffs can never secure an adjudication of the critical issue in the case, based upon a foundation which is certain and sure."

the lands of these appellees. Furthermore, until the landowners alleged and proved that there were no other similar deposits except under the right-of-way taken, the landowners had made no case of scarcity. It is interesting to note that the landowners did not allege or undertake to show any such case of scarcity as regards the clay and gravel deposits. So when we look at the entire record, we see that there was no need for the Highway Commission to show abundance until the landowners had alleged and undertaken to show scarcity. This the landowners never claimed nor sought to show. So the Highway Commission's "good cause"[3] for trespassing on the lands of appellees and drilling exploratory holes was never shown.

(b) *Abuse Of Discretion.* After hearing the Highway Commission's proffered testimony (*i. e.,* the witness McElwaine) the Trial Court concluded that the drilling of holes on the appellees' adjacent lands was not essential to the Highway Commission's case. The Majority, in reversing the Trial Court, is necessarily saying that the Trial Court abused its discretion in refusing to grant the Highway Commission's motion. I can see no abuse of discretion; and I use the words of Chief Judge Orie L. Phillips in his dissenting opinion in *Williams* v. *Continental Oil Co., supra*:

"It is my opinion that in determining whether good cause has been shown, the district court is necessarily vested with a wide discretion, and that its determination of such question should not be disturbed, in the absence of a showing of a clear abuse of discretion."

(c) *The Constitutional Issue.* The Constitution of Arkansas says in Article II, Section 22:

"The right of property is before and higher than any constitutional sanction; and private property shall not be taken, appropriated, or damaged for public use without just compensation therefor."

---

[3] In 8 Ark. Law Review 125, there is a case note entitled: "Trial Practice—Federal rule 34—Showing 'Good Cause' for Discovery."

The concluding sentence of the Majority Opinion in the present case reads:

"We are therefore of the opinion that the Highway Commission is entitled, at a reasonable time in advance of a retrial, to an order permitting it to enter upon the land for the purpose of ascertaining the extent of mineral deposits therein."

There is no safeguard to protect rights of the landowners. Drilling holes on the land will certainly be damaging. In the cases cited by the Majority, there were safeguards made by the Court to protect the landowner against damage. For instance, in *Williams* v. *Continental Oil Co., supra,* it was affirmatively shown that the making of the survey would not damage the well and that the plaintiff would file a reasonable bond to protect the defendant against any damage which might be done in connection with the survey. But, even then, there was to be no drilling, but merely the ascertainment of the direction of a well already drilled. I find no case anywhere—and the Majority Opinion cites none—wherein the drilling of holes has been permitted under the discovery statute. Yet, the Majority is allowing such trespass and damage to be done in this case in the teeth of our constitutional provision which says that private property shall not be damaged for public use without just compensation. Our discovery statute says nothing about drilling holes on lands. The statute merely says that entry may be made on the land ". . . for the purpose of inspecting, measuring, surveying, or photographing . . .", and those words are far less than drilling a hole on the land. The Majority says that the discovery statute should be liberally construed, but I insist that liberality should not be carried to the extreme of unconstitutionality. I regard the Majority Opinion on this discovery statute as an invasion and damage to the rights of private property.

To overcome this point, the Majority Opinion says: "Of course, the Commission may be required to give a bond if the landowners undertake to show, as they have

not yet done, that the drilling may damage the land.'' This quoted sentence I regard as further reason why this Court should not disturb the discretion exercised by the Trial Court in denying the motion of the Highway Commission to drill holes on private property. The burden was not on the landowners to show that the drilling would damage the land: the burden was on the Highway Commission to show that the drilling would *not* damage the land. And I find nothing in the record that shows that the Highway Commission met such burden. How does the landowner know what kind of holes the Highway Department intends to drill? It was incumbent on the Highway Department to show that these holes for core drilling would not be traps into which an animal or person could step and receive a broken leg. The Majority is reversing the Trial Court on a point wherein the Highway Department failed to meet its burden of proof.

For each of the reasons hereinbefore stated, I respectfully dissent on this second issue.

JOHNSON, J., dissents.

JIM JOHNSON, Associate Justice, dissenting. Viewing this case in the light most favorable to appellee, as under our rule we must, I am not wholly convinced of the correctness of the majority's conclusion that the case of *City of Little Rock* v. *Moreland*, 231 Ark. 996, 334 S. W. 2d 229, is distinguishable in legal principle from the case at bar. Since, in my view, a serious doubt does exist, I would resolve such doubt in favor of appellee. Therefore, I respectfully dissent.