ARKANSAS STATE HIGHWAY COMMISSION v.
MARLIN HAWKINS, ET AL

5-4648                                             437 S.W. 2d 218

Opinion Delivered February 3, 1969

[Rehearing denied March 10, 1969.]

*Thomas B. Keys* and *James K. Biddle* for appellant.
*Gordon, Gordon & Eddy* for appellees.

CONLEY BYRD, Justice.    In this eminent domain action appellant Arkansas State Highway Commission ap-

proaches the controversy between it and appellees, Marlin Hawkins, et al, as the taking of 11.01 acres out of a tract of 16.82 acres. Upon this basis it produced as expert witnesses Mr. W. E. Hayes and Mr. Robert E. Hamilton. Mr. Hayes placed the before value at $34,500, and the after value at $31,250, thus arriving at a damage figure of $3,250. Mr. Hamilton gave a before valuation of $27,000 and an after valuation of $81,000 arriving at a $54,000 benefit to the lands.

Mr. Hawkins approaches the controversy on the basis that the 11.01 acre acquisition is out of an 84.66 acre tract partially developed as a subdivision. He testified to damages of $77,500 based upon a before and after valuation of $237,000 and $159,500. Mr. C. V. Barnes and Mr. Lloyd Pearce, expert witnesses on behalf of Hawkins, arrived at damages of $45,500 and $44,500 respectively. Mr. Barnes gave a before and after valuation of $203,000 and $157,500. Mr. Pearce gave a before and after valuation of $212,000 and $167,500.

The jury's verdict was for $55,000. The Highway Commission for reversal relies upon the following points:

> I. The trial court committed reversible error in refusing to strike the value testimony of Marlin Hawkins as to the value of 165 lots before the taking and refusing to strike the value testimony of the damages sustained by Mr. Hawkins and the value testimony after the taking and in permitting testimony as to what it would cost to put water and sewer lines to the property.

> II. The trial court committed reversible error in refusing to strike the opinion of Mr. Lloyd Pearce as to the value of the land before the taking.

III.   The trial court erred in not striking the testimony of Mr. C. V. Barnes as to his value before and after the taking.

IV.   There was no substantial evidence to support the verdict and the appellant is entitled to have the judgment modified and the trial court directed to enter judgment in the sum of $3,250 in favor of Hawkins, et al.

## FACTS

The record shows that the property owners in 1960 acquired a 117 acre tract described as the NW¼ of SE¼ and S½ of SE¼ less three acres in the southwest corner.   This was a family purchase for $13,000.   In 1963 they donated and sold 31 acres to the Petit Jean Vocational Trade School.   After the acquisition of the trade school site, the offsite utilities, including sewer and water, were brought to the property for the use and benefit of the trade school without cost to the property owners.

In 1964 a new high school was built within a half a mile of the Hawkins property.   In 1966 a 20 acre site adjacent to the southeast corner of the property was acquired for construction of a new hospital.

The property owners first platted the property in 1960.   A replat was filed and accepted by the City of Morrilton in 1964.

When replatted, the property was divided into 165 residential lots and three tracts of commercial property totalling 18 acres.   The property was brought into the city and zoned at the time it was replatted.

The property condemned takes all of 11 and part of 15 platted lots and 5.57 acres zoned as commercial. There is also a construction easement affecting 0.56 of an acre

of the commercially zoned property. As a result of the taking 26.19 acres, all residential property, lies north of the interstate highway. The balance, including the remainder of the commercially zoned property, lies south of the interstate. The northeastern corner of the property south of the interstate is bordered on the west by State Highway No. 9 and on the north by the off ramp of the freeway interchange at the intersection of Highway No. 9.

Mr. Hawkins testified that in 1939 and 1940 he was Deputy Sheriff and Collector for Conway County; that from 1941 through 1946, except for two years and five months leave, while in service during World War II, he was the Circuit Clerk and Ex-officio Recorder; and that for the last 17 years he had been Sheriff and Collector.

Because of his duties in such official capacities and his general observation of land transactions in the City of Morrilton and surrounding area, he considered that he knew what property was selling for, prior to the taking. His testimony was that the property was located two and a quarter miles from the county court house, and that the City of Morrilton had a 1960 population of 5,997 but that by 1967 the population had increased to 6,955; that there were 2,100 vehicles on Highway No. 9 in 1965 but that it had increased to 3,050 vehicles by 1967. He showed that the North Hills Addition which lies between his property and the high school was selling improved lots for $25.00 per front foot.

Based upon his knowledge Mr. Hawkins testified that his land immediately before the taking had a fair market value of $237,000; that immediately after it had a fair market value of $159,500 and that his damages would be $77,500. On cross examination he testified that he arrived at the $237,000 figure by calculating the 165 lots at about $1,000 per lot and the 18 acres of commercial at $4,000 per acre. On re-direct Mr. Hawkins

stated that the $1,000 per lot was based on what the whole subdivision as a unit would sell for to one person. At one point in the record Mr. Hawkins said he based the $1,000 per lot upon what he had been offered, but when objection was made, he stated that it was also based upon his knowledge of real estate in the City of Morrilton.

In arriving at the after value of $159,000, Mr. Hawkins considered the taking of 21 lots at $21,000; five partial lots at $500 per lot or $2,500; six acres of commercial property at $4,000 per acre which would be $24,000; and the $30,000 extra cost for the laying of the water and sewer lines. The $159,500 is the difference between what he was damaged and what he valued it originally.

Mr. C. V. Barnes testified that the highest and best use for the property both before and after the taking was for residential and commercial purposes. He described how the construction of the interstate would increase the cost of sewering the property because of the interruption of the gravity flow. He also showed that there would be extra cost in running the water lines under the interstate to the lots lying to the north. In his opinion the fair market value before the taking was $203,000 and the value afterwards was $157,500.

On cross examination Mr. Barnes showed that he arrived at the before value on the basis that the residential lands had a value of $2,000 per acre and that he arrived at the same overall value by assigning a front foot value of $7.50 for lots with no improvements, $9.50 for lots with gravel streets and some improvements, and $10.50 a front foot for lots on the blacktop roads. In arriving at the value of the lands taken, Mr. Barnes used the same front foot value on the theory that the property taken had the higher set of improvements.

Mr. Lloyd Pearce was of the opinion that the highest and best use of the property both before and after

the taking was for the dual purpose of residential building sites and commercial frontage on Highway No. 9. In his opinion the fair market value of the property before was $212,000 and after was $167,500. He placed $39,-785 value on the lands taken, $17,865 damages to the remainder of the lands not taken and a betterment of $13,-150 because of the location with reference to the interchange. On cross examination Mr. Pearce stated that he arrived at a front foot basis per lot by deducting the costs of developing the lots and the profit a developer would expect. He also testified that he calculated the value on an acreage basis and arrived at a valuation of $2,050 per acre for the residential.

Mr. W. E. Hayes, on behalf of the Highway Commission arrived at a value of $34,500. In arriving at his before value he used a per acre value ranging from $1,250 up to $5,000. On cross examination he testified that he considered only the lots or commercial area actually taken or touched. He gave a total enhancement to the remaining lands of $14,605 because of the location of the interchange.

Mr. Robert E. Hamilton testified, on behalf of the Highway Commission, that he considered only the lots or commercial area actually taken or touched by the taking. In his opinion that area had a before value of $27,000 and the remainder after the taking had a valuation of $81,000. The latter figure was on the basis that the interchange enhanced the value of the remainder for a service station site.

I. In contending that all of the valuation testimony of Mr. Hawkins should have been stricken, the Highway Commission relies upon *Ark. State Highway Commission* v. *Watkins*, 229 Ark. 27, 313 S.W. 2d 86 (1958) and *Ark. State Highway Commission* v. *Taylor*, 238 Ark. 278, 381 S.W. 2d 438 (1964).

In the *Watkins* case we quoted Nichols, Eminent Domain, 3rd Ed. as follows:

" 'It is well settled that if land is so situated that it is actually available for building purposes, its value for such purposes may be considered, even if it is used as a farm or is covered with brush or boulders. The measure of compensation *is not* (emphasis supplied) however, the aggregate of the prices of the lots into which the tract could best be divided, since the expense of cleaning off and improving the land, laying out streets, dividing it into lots, advertising and selling the same, and holding it and paying taxes and interest until all the lots are disposed of cannot be ignored and it is too uncertain and conjectural to be computed. The measure of compensation is the market value of the land as a whole, taking into consideration its value for building purposes if that is its most available use.' "

In the *Taylor* case we held that where each lot in a subdivision constitutes a separate and distinct use, that only those lots taken or touched are to be considered in arriving at the compensation to be paid the landowner unless it can be shown that the landowner has suffered special damages to lots not taken. In so holding we quoted from *Wellington* v. *Boston & M. R.R. Co.,* 164 Mass. 380, 41 N.E. 652, as follows:

" 'Upon the evidence, all the other lands of the petitioners had been made separate and distinct parcels by transforming the locality into a village with wrought and travelled streets, and making all the land not included in the streets into exactly defined house lots, some of which had been sold to other persons, and each of which then owned by the petitioners was held for the distinct purpose of independent sale. Whether a particular lot of land constitutes an independent parcel is a question which cannot be determined in the affirmative by the mere fact that it is separated from other land by a highway or street, or by paper lines, or by

ances; nor can it be determined in the negative by the mere fact that it is all in one ownership, and is not divided by streets or by paper lines. But when, as in the present case, the evidence shows that there is an actual division by streets, wrought and in use for travel, and by recorded paper lines, and there is no evidence that any two of the lots are used together, or are held for sale as one parcel, and the only use shown is a separate and distinct use and holding of each lot by itself, we think each lot is a separate and distinct parcel.' ''

Here the subdivision had developed to the point that the utility mains had been brought to the property but no laterals or service lines has been installed, some improvements were in place and the paper lines had been recorded but the developer was obligated to install all of the improvements to a lot before he could launch a sales promotion. Thus the subdivision had reached the stage where it had been divided into recorded paper lines but no parcel could be considered for a separate and distinct use for lack of the installation of utility service lines.

Some of the difficulties involved in classifying the property as developed or undeveloped for purposes of permitting a per lot valuation or the assessment of damages to lots not taken or touched can best be demonstrated by the Highway Commission's different positions. The Highway Commission not only described the property taken according to the paper lot lines, but contended that it was error to consider damages to the lots not taken or touched by the condemnation order. Of course this position could only be taken if the individual parcels constituted separate and distinct units. In making the contention that it was error for Mr. Hawkins to value the property on a per lot basis, the Highway Commission, in relying upon the *Watkins* case, supra, must take the position that the property involved is not a subdivision consisting of separate and distinct parcels.

Under the proof here, the per lot valuation given by Mr. Hawkins was upon the basis of what all of the lots could be sold for to one buyer upon an "as is" basis. While the lines of the residential lots were only a paper division, they constituted a unit of measure that was before the jury, and so long as the testimony is based on what a willing buyer would pay for the total of the units in their present status (as distinguished from that which would accrue if sold at a developed retail price), we are unable to see the vice or speculative value condemned in the Watkins case. After all, any other unit valuation on an "as is" basis would reach the same result for any prudent buyer of property suitable for development would have to do some calculation of the number of lots that could be carved out of the property in its present state. Consequently we find no error in permitting the per lot unit of valuation under the circumstances here involved.

In *Ark. State Highway Commission* v. *O. & B. Inc.*, 227 Ark. 739, 301 S.W. 2d 5 (1957), all of the witnesses agreed that the highest and best use of the two unplatted lots was for residential purposes. In holding that it was permissible to show the number of lots into which the property could be divided and their value after deduction of improvement costs, we said:

"Nor do we agree with the further contention that the court erred in admitting testimony relative to the division of the two plots into residential lots and its net value for such purposes after deduction of improvement costs. The established rule in this state in cases like this is that the owner may be allowed to show every advantage that his property possesses, present and prospective, in order that the jury may satisfactorily determine what price it could be sold for upon the market. *Little Rock Junction R. Co. Woodruff*, 49 Ark. 381, 5 S.W. 792, 5 Am. St. Rep. 51; *Kansas City Southern R. Co.* v. *Boles*, 88 Ark. 533, 115 S.W. 375.

64

"Appellant concedes that potential use of land for subdivision purposes may be considered in establishing market value but says it is error to show the number and value of lots into which a certain tract may be divided. Cases from other jurisdictions supporting this argument involve facts quite different from those in issue here. This is not a case where use for subdivision purposes is merely speculative and too remote to influence present market value. As previously indicated, it is undisputed that the land of appellees was adjacent to and surrounded by well developed residential sections of the fast growing City of Jacksonville and that its best and most logical use was for residential lot development. In these circumstances we have held the testimony objected to by appellant to be admissible to establish market value."

Neither can we find any error in permitting the property owner to show the extra cost involved in installing the sewer and water after the taking. Even under our holding in the *Taylor* case, this cost would classify as special damages not suffered by the public in general, for Mr. Hawkins was obligated under the subdivision regulations of the City of Morrilton to install the utilities before the different parcels could be put to a residential use.

II. Appellant's argument with references to Lloyd Pearce's testimony is that his valuation was upon a lot basis—i.e., that it was too speculative. As we read his testimony, he arrived at his valuations both on an acreage basis and a front foot basis. The front foot basis was calculated by deducting the cost of improvements not yet made and the profit a developer would require from the selling price of lots similarly situated. Since he demonstrated that he arrived at the same total valuation under both methods, we are not in a position to say his testimony was so speculative that it should have been stricken.

III. The objection to Mr. Barnes' testimony is identical to that of Mr. Pearce's. The record also shows that Mr. Barnes calculated the total valuations both on the per acre unit basis and by the front foot method. He says that the latter method was a check against the acreage valuation. When we consider the fact that the property involved in the taking had some of the higher improvements, we are not in a position to say that Mr. Barnes' testimony should have been stricken.

In finding no error here, we must point out that the situation in the *Watkins* case was much clearer cut than is the stage of the development here.

IV. Under this point appellant argues that there was no substantial evidence to go to the jury. As we have amply demonstrated above, the evidence of Mr. Hawkins, alone, is sufficient to sustain the verdict. It has been suggested that Mr. Hawkin's valuation of $4,000 per acre on his commercial property has no relation to any fact. However the record shows that Mr. Hawkins was as familiar with the comparable sales in the area as any other witness. Even Mr. Hayes, a witness for the Highway Commission, after making a study of the market, found valuations ranging from $1,250 to $5,000 per acre.

Affirmed.

GEORGE ROSE SMITH and BROWN JJ., dissent.

Justice JONES would grant remittitur of $9,500.00.

GEORGE ROSE SMITH, J., dissenting. The jury's verdict in this case awarded the landowners $55,000 for 11.01 acres of land, or about $5,000 an acre. If we leave the realm of opinion and look only to actual facts established by uncontradicted evidence in the record, it is an inescapable conclusion that the highway department is being compelled to pay an unconscionable price for

the land. Hawkins bought 117 acres in 1960 for $13,-000, thereby paying $111.11 an acre for property that is now valued at $5,000 an acre. At the time of the trial the 211 lots were assessed on the tax books at a total of $5,275, or exactly $25 a lot. If the assessment represented 20% of the fair market value, as the law contemplates, the property was valued by the assessor at $125 a lot, or $600 an acre, there being about 4 lots to the acre.

Hence the verdict can be sustained only on the basis of opinion. More specifically, it can be sustained only on the basis of Hawkins's own opinion, for not even his own expert witnesses fixed his just compensation at a figure as high as the amount of the verdict. Thus the pivotal issue on appeal is the admissibility of the landowner's opinion about the value of the property being taken and about the damage to the rest of his lands.

Hawkins's figures were arrived at solely by assigning a value to each lot in his addition and multiplying that value by the number of lots. He valued 165 residential lots at $1,000 each and 18 commercial acres at $4,000 an acre, making a total value of $237,000 immediately before the taking. He calculated his damages at $21,000 for 21 lots taken, $2,500 for 5 lots partly taken, $24,000 for six commercial acres taken, and $30,000 for the increased cost of laying water and sewer lines (a figure not supported by any fact in the record), making a total of $77,500.

Under our prior cases Hawkins's opinion evidence was plainly inadmissible. His residential addition existed on paper only. It was first platted in 1960, when it seems to have been known that the interstate highway was to be located somewhere in the vicinity. It was replatted in 1964, when more exact information about the location of the highway was available. But by the date of trial nothing had been done toward the development of the addition except a negligible amount

of clearing with a bulldozer. Neither streets nor utilities had yet been provided. The tract was still raw land.

Our cases uniformly hold that in such a situation it is not permissible to arrive at a valuation on the basis of individual lot values. As it happens, most of our cases have dealt with unrecorded plats, but it goes without saying that the basic rule is not changed by the mere filing of a plat with the circuit clerk. *Union Elec. Power Co.* v. *Sauget,* 1 Ill. 2d 125, 115 N.E. 2d 246 (1953); *Pickett* v. *Kolb,* 237 N.E. 2d 105 (Ind., 1968). The issue is one of substance, not of mere form.

We reviewed our earlier decisions in this language in *Housing Authority of the City of Camden* v. *Reeves,* 244 Ark. 783, 427 S.W. 2d 196 (1968):

> We have consistently held that such a lot-and-block plat is not admissible when the subdivision has really not yet come into existence. The reason for the exclusionary rule is that such an exhibit is apt to mislead the jury into valuing the property as consisting of so many lots, without adequately considering necessary development expenses such as the construction of streets and utility lines, which could not be properly explained to the jury without bringing a host of collateral issues into the case. *Arkansas State Highway Comm.* v. *Parks,* 240 Ark. 719, 401 S.W. 2d 732 (1966). In several of the cases relied upon by the Housing Authority, the subdivision portrayed by the plat was not beyond the planning stage, so that the admission of the plat was fairly sure to mislead the jury. That point was discussed in detail in *Arkansas State Highway Comm.* v. *Watkins,* 229 Ark. 27, 313 S.W. 2d 86 (1958), where it was admitted that the land had not been developed at all as a subdivision. Similar non-existent subdivisions were involved in *Arkansas Louisiana Gas Co.* v. *Howard,*

240 Ark. 511, 400 S.W. 2d 488 (1966), and *Arkansas Louisiana Gas Co.* v. *Lawrence,* 239 Ark. 365, 389 S.W. 2d 431 (1965). Such an exhibit is especially misleading when, as in the *Watkins* case, it is accompanied by testimony about the value of the fictitious lots.

Even more precisely in point in the case at bar is *Arkansas State Highway Commn.* v. *Watkins,* 229 Ark. 27, 313 S.W. 2d 86 (1958), because there the plat was not introduced; so, as here, we were considering the admissibility of opinion evidence about the value of lots in an addition existing only on paper. Excerpts from the opinion:

> The measure of compensation *is not* (emphasis supplied) however, the aggregate of the prices of the lots into which the tract could best be divided, since the expense of cleaning off and improving the land, laying out streets, dividing it into lots, advertising and selling the same, and holding it and paying taxes and interest until all the lots are disposed of cannot be ignored and it is too uncertain and conjectural to be computed. The measure of compensation is the market value of the land as a whole, taking into consideration its value for building purposes if that is its most available use.

> \*    \*    \*    \*

> "It is proper to show that the property is suitable for division into village lots, and that it is valuable for that purpose, but it is not proper to show the number and value of such lots." Lewis, Eminent Domain, Vol. 2 (2nd Ed.) P. 1058.

The majority opinion in this case cannot be reconciled with our prior holdings. Two efforts are made to distinguish the law as we have previously stated it, but neither effort can stand scrutiny. First, it is said that the highway department itself recognized "the paper lot lines" (an apt description!) by describing the property

by lot numbers in its pleadings. That procedure was unquestionably right, for when an addition has been platted a description by reference to the plat is valid. Indeed, that is ordinarily the only legal way to describe the lots. Secondly, it is said that a prudent buyer would have to do some calculation of the number of lots that could be carved out of the property in its present (undeveloped) state. Of course that is true, but exactly the same thing could have been said in the *Watkins* case and in our other decisions rejecting such testimony. The point is not what a prudent buyer might consider in pricing the property; it is what kind of opinion evidence is sufficiently reliable to be submitted to a jury of laymen. Our prior cases have unequivocally ruled out testimony such as Hawkins's opinion in this case.

In truth, Hawkins's testimony is also vulnerable to the rule that an opinion not supported by any fair or reasonable basis is not substantial evidence. *Arkansas State Highway Commn.* v. *Stanley*, 234 Ark. 428, 353 S.W. 2d 173, 4 A.L.R. 2d 749 (1962). Hawkins's evaluation of his property at $4,000 an acre had, as we said in the *Stanley* case, no relation to any fact in the record. On cross-examination he conceded the purchase prices involved in many sales of comparable or even more desirable property in the same vicinity as his lands. For instance, the St. Anthony's Hospital property sold for $1,200 an acre; the R. W. Morgan, Jr., property for $1,000 an acre; the Carl Long property for $1,143 an acre; the Rex Jones property for $1,365 an acre; the Dr. Englehoven property for $600 an acre, and the Hodge property for $600 an acre. In the teeth of all those actual sales at arm's length Hawkins still insisted that in his opinion his property was worth $4,000 an acre. Just as in the *Stanley* case, that figure "seems to have been plucked from the air and might equally well have been ten thousand dollars or a hundred million dollars." Such fanciful figures are not substantial evidence.

I would reverse the judgment and remand the cause for a new trial.

BROWN, J., joins in this dissent.